**GUESTHOUSE INTERNATIONAL, LLC**

v.

**SHONEY'S NORTH AMERICA CORPORATION and** Sholand, LLC.

Court of Appeals of Tennessee, Western Section, at Nashville.

June 24, 2009.[1]

March 18, 2010.

Permission to Appeal Denied by Supreme Court Sept. 23, 2010.

---

1. After oral argument in this case, the record was remanded to the trial court clerk for pagination of substantial portions of the voluminous record. The attorneys then submitted revised briefs referencing the newly-paginated documents. The Court appreciates this assistance in organizing and providing references to the paginated record.

Eugene N. Bulso, Jr., and Melissa Ballengee Alexander, Nashville, Tennessee, for Plaintiff/Appellant, GuestHouse International, LLC.

William L. Harbison and J. Scott Hickman, Nashville, Tennessee, and Mark S. VanderBroek, Atlanta, Georgia, for Defendant/Appellee, Shoney's North America Corporation.

Robb S. Harvey and Richard G. Sanders, Jr., Nashville, Tennessee, for the appellee, Sholand, LLC.

## OPINION

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and DAVID R. FARMER, J., joined.

This appeal involves a licensing agreement for service marks protected under trademark laws. One of the defendants is the owner of the service marks, which are used at both restaurants and motels. This original owner of the service marks sold the motel business along with the service marks, but it retained the restaurant business. After using the service marks for many years, the owner of the motel business decided to convert its motels from the service mark brand to another brand. Eventually, the owner of the motel business sold its motels to the plaintiff, and it included in the sale its rights under the service mark license agreement. Soon after that, the owner of the service marks sold its restaurant business and its service marks to the other defendant herein. When the plaintiff motel business attempted to franchise new motels using the service mark name, the defendant new owner of the service marks objected and terminated the license agreement. The plaintiff motel business filed this lawsuit, alleging breach of contract, tortious interference with contract, and violation of the Tennessee Consumer Protection Act. It sought declaratory relief, injunctive relief, and restitution. The new service mark owner asserted that the license agreement was unenforceable based on lack of consideration, waiver, and fraud. The parties filed cross-motions for summary judgment. The trial court denied the plaintiff's motion for summary judgment and granted summary judgment in favor of the defendants. The trial court concluded, *inter alia*, that the service mark license agreement assigned to the plaintiff was invalid for lack of consideration and, alternatively, that the plaintiff waived its right to franchise new motels using the service mark name. The plaintiff's complaint was dismissed in its entirety. The plaintiff now appeals. We reverse, finding, *inter alia*, that the license agreement was supported by consideration, that no valid basis existed on which to terminate the license agreement, and that the doctrine of waiver is not applicable under the facts in this case. Further-

more, we find that the dismissal of the request for restitution as a remedy for the defendant's breach of contract is premature at this juncture.

This appeal involves a dispute over the use of the SHONEY'S INN ® and SHONEY'S INN & SUITES ® name and service marks (hereinafter "Shoney's Inn service marks"),[2] protected under federal and state trademark laws. The facts involve a complicated sequence of transactions spanning a nearly eighteen-year time period, and multiple entities with similar and overlapping names. We must review them in some detail.[3]

### PARTIES

Plaintiff/Appellant GuestHouse International, LLC, is a South Dakota limited liability company. This Opinion will refer to "GuestHouse" as inclusive of Guest-House International, LLC, GuestHouse International, Inc., and an affiliated company, Settle Inn, LLC.

Defendant/Appellee Sholand,. LLC, is a Tennessee limited liability company. Its predecessors are Shoney's, Inc., and Shoney's, LLC, with subsidiary Shoney's Lodging, Inc., and affiliate Shoney's Investments, Inc. Shoney's, Inc., is the original holder of the rights to the Shoney's Inn service marks, and it is the original

franchisor of both the Shoney's restaurant chain and the Shoney's Inn motel chain. For purposes of clarity, this Opinion will refer to "Old Shoney's" as inclusive of Shoney's, Inc., Shoney's, LLC, Shoney's Investment, Inc., or Sholand, LLC.

Defendant/Appellee Shoney's North America Corporation (NAC) is a Georgia corporation and the current holder of the rights to the Shoney's Inn service marks; it now operates the Shoney's restaurants. This Opinion will refer to "New Shoney's" as inclusive of Shoney's NAC and affiliated companies such as Shoney's USA.[4]

Entities involved in the pertinent transactions but not a party to the litigation are ShoLodge, Inc.,[5] and subsidiary ShoLodge Franchise Systems, Inc., later taken private as ShoLodge Franchise Systems, LLC. The term "ShoLodge" will be used herein as inclusive of these entities. Sho-Lodge is Plaintiff/Appellant GuestHouse's predecessor in interest under the license agreement at issue.

### FACTS

Prior to 1975, Old Shoney's was the owner/holder of the SHONEY'S ® name and service marks, used in connection with the once-ubiquitous chain of casual dining restaurants known as Shoney's restaurants.[6] In 1975, Old Shoney's began to

---

**2.** A service mark is a trademark related to services rather than products. 74 Am.Jur.2d *Trademarks and Tradenames* § 3 (2001).

**3.** As an aid to understanding the facts, a summary of the essential parties and transactions in this case is attached as an Appendix to this Opinion.

**4.** The terms "Old Shoney's" and "New Shoney's" to identify these parties were used for convenience by the parties in depositions and by counsel for the parties at oral argument in this appeal. By using these terms in this Opinion to refer to the Defendants/Appellants, we do not intend to ignore formalities or

disrespect the entities involved. However, in light of the potential for confusion caused by the similarities in the names of the entities, the Court hopes that the use of these inclusive descriptive names will simplify the discussion.

**5.** ShoLodge was formerly known as Gulf Coast Development, Inc.

**6.** In some states, including Tennessee, Shoney's was once affiliated with the Big Boy restaurants. The restaurants were known as Shoney's Big Boy, with the statue in front of the restaurant of a chubby, wide-eyed boy in distinctive red-and-white check overalls, holding aloft a double-decker Big Boy hamburger.

own, operate, and franchise limited-service motels under the name "Shoney's Inn." Old Shoney's structured the motel franchises in a manner to create a mutually beneficial relationship between the motels and the restaurants. Shoney's Inn motels did not have a restaurant in the motel, but they were located adjacent to or very near a Shoney's restaurant. Thus, together, the restaurant offered food services and the motels offered lodging to the traveling public.

In December 1980, Old Shoney's formed a subsidiary for its lodging division called Shoney's Lodging, Inc. ("Shoney's Lodging"). Shoney's Lodging continued to own, operate, and franchise the motels under the "Shoney's Inn" name.

In 1991, Old Shoney's sold subsidiary Shoney's Lodging to ShoLodge.[7] As part of the sale, on October 25, 1991, Old Shoney's and ShoLodge entered into a long-term License Agreement ("1991 Original License Agreement").[8] Under this agreement, Old Shoney's retained ownership of the Shoney's Inn service marks, but it granted ShoLodge a nonexclusive license to use the service marks in connection with motels. ShoLodge had the right to assign its license to a suitable assignee, subject to the approval of Old Shoney's. In return, Old Shoney's was to receive a royalty of 0.5% of the gross revenues generated by the Shoney's Inn motels.[9] The symbiotic relationship between the Shoney's restaurants and the Shoney's Inn motels was

built into the 1991 Original License Agreement. By its terms, ShoLodge agreed not to serve food at its hotels but instead to promote the nearby Shoney's restaurant. The 1991 Original License Agreement provided that ShoLodge's license would continue to be in effect until the expiration of the last franchise agreement entered into between ShoLodge and any Shoney's Inn franchisee.

In the ensuing years, Old Shoney's and ShoLodge enjoyed a "very cordial" relationship. As the franchise system grew and developed, the parties amended the 1991 Original License Agreement to accommodate the business needs of both parties. Between September 1992 and June 1996, the 1991 Original License Agreement was amended by agreement on four separate occasions. During this time, there came to be nearly a thousand Shoney's restaurants in operation.

By late 1996, the number of Shoney's restaurants in operation had decreased to 844, and Old Shoney's sought an infusion of cash. To that end, on October 25, 1996, Old Shoney's and ShoLodge executed a fifth amendment to the 1991 Original License Agreement, under which Old Shoney's accepted a buyout of all future license royalties. Under this amendment, ShoLodge paid Old Shoney's a one-time lump sum of $5.25 million in lieu of all future royalties which would otherwise have been due under the 1991 Original License Agreement.[10]

Shoney's ended its affiliation with Big Boy prior to the events that are the subject of this appeal, and the restaurants thereafter were simply Shoney's restaurants.

7. ShoLodge renamed the subsidiary Sho-Lodge Franchise Systems, Inc.

8. The long-term license agreement was originally between Shoney's Investments, Inc., and Shoney's Lodging, Inc. "Shoney's Lodging,

Inc." became "ShoLodge, Inc." on December 28, 1991.

9. The arrangement under which royalties would be paid involved other factors not relevant to this appeal.

10. The "Licensor," the entity that received the $5.25 million lump sum payment, was Shoney's Investments, Inc., a Nevada corporation. The amendment states that it is gov-

### Amended and Restated License Agreement

The Shoney's restaurant business continued to experience financial and operational difficulties. By October 29, 2000, the number of Shoney's restaurants in operation had diminished to 459. Many of the restaurants that had closed were adjacent to Shoney's Inn motels. This created considerable difficulties for the affected Shoney's Inn motels. If the Shoney's restaurant near the motel closed, the motel was left essentially without food service for its guests, because the 1991 Original License Agreement precluded the motels from operating a restaurant.

To address this situation, ShoLodge proposed yet another amendment to the 1991 Original License Agreement. Under this proposed sixth amendment, if the Shoney's restaurant adjoining a Shoney's Inn motel closed, the franchise motel owner would be permitted to operate a restaurant inside the motel.

In general, Old Shoney's was agreeable to the proposed amendment. However, rather than draft "Amendment No. 6" to the 1991 Original License Agreement, the parties decided to draft a new agreement. Thus, on September 27, 2000, the parties executed an 18–page "Amended and Restated License Agreement" (hereinafter "Amended and Restated License Agreement").[11] The Amended and Restated License Agreement acknowledged the existence of the 1991 Original License Agreement and all the amendments thereto, and it stated that it was intended to "further amend and restate [the parties'] agreements contained in the License Agreement, as previously amended." It granted ShoLodge a non-exclusive license to use the Shoney's Inn service marks in connection with its operation of motels, but it provided for no monetary payments to Old Shoney's in exchange for the license. Under the Amended and Restated License Agreement, ShoLodge was permitted to operate a restaurant inside or adjacent to its Shoney's Inn motels for which there was no adjacent operating Shoney's restaurant.[12] In such Shoney's Inn motels, ShoLodge agreed to install a plaque on the restaurant's wall stating that the restaurant operated inside the Shoney's Inn was not a Shoney's restaurant, nor was it affiliated with the Shoney's restaurant chain. The Amended and Restated License Agreement dropped the provision in the prior license agreements that required the approval of Old Shoney's over the site selection for Shoney's Inn franchise motels. In addition, ShoLodge agreed to eliminate a warranty by Old Shoney's that was originally contained in Section 2.2 of the 1991 Original License Agreement. The remainder of the Amended and Restated License Agreement outlined areas such as the terms of the agreement, assignment by ShoLodge of its license, termination, and the like; in all ways pertinent to this appeal, these remaining terms were substantially as they had been under the 1991 Original License Agreement, as amended.

### Conversion from Shoney's Inn Motels to GuestHouse Brand

The Shoney's restaurant chain continued to encounter difficulties. By 2002, the

---

erned by Nevada law. Shoney's Investments, Inc., has since been subsumed into Sholand, LLC.

11. The Licensor under the Amended and Restated License Agreement was Shoney's Inc., a Tennessee corporation, and the Licensee was ShoLodge Franchise Systems, Inc., also a Tennessee corporation. Nevertheless, the agreement provided that it would be construed in accordance with Nevada law.

12. Under the agreement, "adjacent to" meant "within a one mile radius."

chain had only 351 operating Shoney's restaurants. ShoLodge determined at that time that the Shoney's brand had become more of a burden than a benefit, and it embarked on a course of action to change its brand for the motels. In May 2002, ShoLodge purchased the GuestHouse Inn & Suites hotel chain, based in Atlanta, Georgia, which had about seventy existing hotels. It then set about a plan to convert the existing Shoney's Inn motels into GuestHouse Inn & Suites hotels. To that end, ShoLodge had meetings with its franchisees and sent letters to them, encouraging the franchisees to convert their Shoney's Inn motels to GuestHouse Inn & Suites hotels. ShoLodge described the GuestHouse brand as a "clean name, [with] no baggage attached." Among the advantages to conversion that were touted to franchisees was that the franchisee would be "unburdened from a sometimes confusing relationship with the Shoney's restaurant chain" and would obtain a motel name that was "not associated with a declining restaurant chain." As part of the new strategy, ShoLodge decided to make no further efforts to open additional Shoney's Inn motels. ShoLodge issued a press release in May 2002 stating: "All new franchising will be done under the GuestHouse name."

ShoLodge's revised business strategy was communicated internally within the organization and to its shareholders. For example, in an August 2002 report to the ShoLodge Board of Directors, ShoLodge's CFO reported that "[n]o Shoney's Inn franchises have been sold in 2002 and none are to be sold in the future." In his letter to ShoLodge shareholders, contained in

the 2002 ShoLodge Shareholders Annual Report, ShoLodge's CEO informed shareholders of ShoLodge's "plan to convert all of the Shoney's brand properties to the GuestHouse brand and intention to franchise only the GuestHouse name in the future." ShoLodge's 2002 Form 10–K Annual Report filed with the Securities and Exchange Commission ("SEC") declared that "[n]o more attempts will be made to franchise the Shoney's Inn brand," and that "[n]o additional Shoney's Inns will be developed or franchised in the future." [13] Consistent with its stated perception of the value of the Shoney's brand, in 2002, ShoLodge wrote off the intangible asset comprised of the Shoney's Inn rights under the Amended and Restated License Agreement, deeming them "worthless." The entire value of those rights was written off, a value of over $6.4 million.

ShoLodge also communicated the new business strategy to Old Shoney's representatives. The general counsel for Old Shoney's had discussions with ShoLodge's president in which ShoLodge's president indicated that ShoLodge planned to discontinue using the Shoney's Inn brand and to convert all of the Shoney's Inn motels to the GuestHouse brand.

True to its word, ShoLodge opened no new Shoney's Inn motels and, over the next several years, methodically converted its Shoney's Inn motels to the GuestHouse brand. By 2006, ShoLodge had converted all but four or five of its Shoney's Inn motels to GuestHouse Inn & Suites hotels.

### Consent and Estoppel Agreement

In 2006, ShoLodge decided to simply sell the motel business in its entirety.

13. The only public hedge by ShoLodge regarding its announced strategy was in its Uniform Franchise offering Circulars (UFOC's) to prospective franchisees, in which ShoLodge stated that it "may in the future recommence offering franchises for Shoney's Inn," and

noted that it was "not restricted in any way from ... franchising 'Shoney's' properties...." In depositions, ShoLodge officers maintained they did not intend to relinquish the right to franchise new Shoney's Inn motels.

ShoLodge entered into negotiations with Settle Inn, LLC ("Settle Inn"), the parent company of Plaintiff/Appellant Guest-House. Settle Inn and GuestHouse[14] expressed an interest in acquiring Sho-Lodge's GuestHouse Inn & Suites hotel system. ShoLodge insisted that the four or five remaining Shoney's Inn motels be included in its sale of the GuestHouse chain. However, any sale of the Shoney's Inn motels would necessarily have to include an assignment of ShoLodge's license to use the Shoney's Inn service marks. Therefore, under the Amended and Restated License Agreement, Sho-Lodge was required to obtain the express consent of Old Shoney's to the assignment of the Amended and Restated License Agreement from ShoLodge to Settle Inn/GuestHouse.[15] Obtaining such consent was apparently not critical to the overall transaction, however, because the asset purchase agreement between Sho-Lodge and Settle Inn included a "Special Condition" providing that, even if Sho-Lodge could not obtain the consent of Old Shoney's to the assignment of the license agreement, ShoLodge would proceed with the sale of the GuestHouse Inn & Suites hotel system only "with no adjustment to the Purchase Price."[16]

In the course of obtaining the consent of Old Shoney's to the assignment of Sho-Lodge's license to use the Shoney's Inn service marks, on November 15, 2006, Sho-Lodge's President, Jim Grout ("Grout"), sent an email to the Old Shoney's general counsel, Ted Habermann ("Habermann"). The email asked Old Shoney's to execute a Consent and Estoppel Agreement, consenting to the assignment of the Amended and Restated License Agreement:

ShoLodge is selling its GuestHouse hotel division to a new company, Guest-House International LLC. As part of the transaction, we are transferring the license agreements for the five remaining Shoney's Inns to the new company. I would appreciate it if you would execute (or have executed) the attached consent agreement.

The new company consists of executives of Settle Inn. You can read about the company at *www.settleinn.com*. The transaction's main purpose is for Settle Inn to purchase the assets of Guest-House International Franchise Systems, Inc. but since ShoLodge still has the five Shoney's Inn franchises, these have become part of the transaction.

The principal is Mr. Brendan Watters. He is here in our offices today completing his due diligence should you wish to speak to him about his company.

Habermann did not contact GuestHouse CEO Brendan Watters, as suggested in Grout's email.[17] Based on his past conversations with ShoLodge executives as well as Grout's email, Habermann assumed that Settle Inn and its subsidiary and assignee GuestHouse, like ShoLodge, had no interest in promoting or attempting to franchise new Shoney's Inn motels. For his part, however, GuestHouse CEO Watters knew at this time that he wanted Guest-House to "reintroduce" the Shoney's Inn motel brand. This information was not conveyed to Old Shoney's.[18]

14. GuestHouse is the assignee of Settle Inn.

15. This was required under Section 4.8 of the Amended and Restated License Agreement.

16. The CEO of Settle Inn and GuestHouse, Brendan Watters ("Watters"), commented that the Shoney's Inns had simply been "chucked in" to the deal.

17. There were no communications between Old Shoney's and GuestHouse at that time.

18. Watters later said of the Shoney's Inn brand, "[W]e were sure we were going to do something with it; we just didn't know where we were going to position it."

In any event, as requested, on December 1, 2006, Old Shoney's executed the Consent and Estoppel Agreement proffered by ShoLodge. The Consent and Estoppel Agreement was signed only by Old Shoney's.[19] In it, Old Shoney's consented to ShoLodge's assignment of the Amended and Restated License Agreement to GuestHouse, subject to GuestHouse's written agreement to assume ShoLodge's obligations under the Amended and Restated Agreement.[20] Old Shoney's also certified that the Amended and Restated License Agreement had not been modified since the execution thereof, and that it remained a valid and binding instrument.

After Old Shoney's signed the Consent and Estoppel Agreement, ShoLodge executed an assignment of its rights as licensee under the Amended and Restated License Agreement to GuestHouse. Thus, at that point in time, GuestHouse became the licensee under the Amended and Restated License Agreement, and Old Shoney's remained the licensor. In the transaction, GuestHouse acquired not only the GuestHouse brand hotels, but also the four or five remaining Shoney's Inn motels.

### Asset Purchase by New Shoney's

Meanwhile, Old Shoney's was in negotiations to sell substantially all of its assets to New Shoney's, including all of the Shoney's restaurants and all of the "Shoney's" trade-mark-protected marks, including the Shoney's Inn service marks.[21] Though Old Shoney's was not obligated to do so, out of an abundance of caution, Old Shoney's general counsel Habermann sent a letter to GuestHouse on December 22, 2006, informing GuestHouse of the impending sale of the Old Shoney's assets to New Shoney's, seeking GuestHouse's consent. GuestHouse did not object to the sale, but it would not agree to the terms of Habermann's letter. Habermann did not pursue it further, because GuestHouse's consent to the sale was not required.

In January 2007, Old Shoney's and New Shoney's closed the sale of the Old Shoney's assets to New Shoney's. The transaction included an asset purchase agreement that listed contracts material to the transaction, representing that each was valid, binding, and enforceable. The list of material contracts included the Amended and Restated License Agreement and the Consent and Estoppel Agreement. However, at the time the asset purchase agreement was executed, New Shoney's had the understanding that the Shoney's Inn brand was being phased out, and that there would be no attempts to franchise additional Shoney's Inn motels. After acquiring the Old Shoney's assets, including the "Shoney's" intellectual property, the primary focus of New Shoney's became "to revitalize and reinvigorate the SHONEY'S ® restaurant brand and return it to a preeminent status as one of America's largest and best family dining restaurant chains." The direction in which New Shoney's planned to take the Shoney's restaurant chain was the subject of an article that appeared in the Nashville newspaper, *The Tennessean*, in approximately April 2007.

19. The signatory to the Consent and Estoppel Agreement was Shoney's, LLC, which has since changed its name to Sholand, LLC.

20. The Consent and Estoppel Agreement also stated that it was made for the benefit of GuestHouse, and it acknowledged that GuestHouse's assumption of ShoLodge's obligations was based "on the truth and accuracy of the matters set forth in" the Consent and Estoppel Agreement.

21. Old Shoney's and New Shoney's executed a letter of intent on the anticipated transaction on November 26, 2006.

### GuestHouse Plan to Re–Launch Shoney's Inns

From the public announcement, the GuestHouse management learned that New Shoney's had acquired the Old Shoney's assets and planned to restore the Shoney's restaurant business to glory. This knowledge prompted GuestHouse to decide that the time was right to re-launch the Shoney's Inn motels. GuestHouse prepared new sign standards, new marketing materials, press releases, and a new franchise agreement. Under the terms of the Amended and Restated License Agreement, in order to franchise new Shoney's Inn motels, GuestHouse was required to seek approval from New Shoney's of certain legal franchising documents. Therefore, on June 25, 2007, GuestHouse sent a letter to New Shoney's, enclosing a draft of the new proposed Shoney's Inn franchise agreement for the approval of New Shoney's.

GuestHouse's letter was not well received. In its response, New Shoney's did not directly address the proposed franchise documents, but instead objected overall to GuestHouse using the name "Shoney's" in connection with new motels. New Shoney's said that doing so would adversely affect its efforts to expand and preserve the goodwill associated with the Shoney's restaurant brand.

In reply, GuestHouse took the position that it had the right under the Amended and Restated License Agreement to use the Shoney's Inn name in franchising new motels. Its letter to New Shoney's indicated that it intended to move forward with its plans.

The New Shoney's rejoinder reiterated its overall objection to GuestHouse's use of the Shoney's name. New Shoney's commented that the license for the Shoney's Inn brand was assigned to GuestHouse "in circumstances in which we are informed that both parties planned for the eventual cessation of use of the Shoney's name in connection with lodging services." GuestHouse's response disputed that either GuestHouse "or its predecessor" planned to cease using the Shoney's Inn name.

Apparently undeterred by the objections from New Shoney's, on August 16, 2007, GuestHouse went public with its intentions, issuing a press release announcing its plan to relaunch the Shoney's Inn motel brand.

### Termination Letter

GuestHouse's announcement prompted an immediate escalation of the dispute. The next day, counsel for New Shoney's sent GuestHouse a letter in which it rescinded and terminated the Amended and Restated License Agreement. New Shoney's stated first that its rescission of the agreement was based on lack of consideration. It asserted that the right to use the Shoney's Inn service marks granted by Old Shoney's to ShoLodge in the Amended and Restated License Agreement was not supported by consideration, because it "provides for no payments or any other form of compensation or benefit to the Licensor" in exchange for the "virtually unlimited right to use the SHONEY'S INN Marks for operation of motels." [22]

---

**22.** The New Shoney's letter protested:

> In fact, the more successful that [New Shoney's] is in its plan to revitalize the SHONEY'S brand and expand the number of SHONEY'S restaurants, the more likely it is that GuestHouse will expand its franchising of SHONEY'S inn motels, again without paying any compensation to [New Shoney's]. This is not only fundamentally unfair; but also vividly illustrates that the Amended and Restated License Agreement is invalid for lack of consideration.

In the alternative, New Shoney's said, its rescission and termination of the agreement was based on fraud, under Section 7.1 of the Amended and Restated License Agreement.[23] The letter noted that, by 2002, ShoLodge had essentially stopped franchising new Shoney's Inn motels and had formally announced its intent never to do so in the future in filings with the SEC. New Shoney's stated that Old Shoney's executed the Consent and Estoppel Agreement "in reliance on the representations that had been made by GuestHouse and ShoLodge since at least 2002, that Guest-House would continue to operate the few existing SHONEY'S INN motels but that '[n]o more attempts [would] be made to franchise the Shoney's Inn brand.'" It said that GuestHouse's failure to disclose its plans amounted to fraud and misrepresentation that warranted rescission and termination.

In addition, New Shoney's commented that it had "recently learned that on December 2, 2006, ShoLodge, Inc. sold Guest-House to Settle Inn LLC ("Settle Inn")." Based on this erroneous information, New Shoney's charged that "neither ShoLodge, GuestHouse, nor Settle Inn ever sought or obtained Shoney's consent to ShoLodge's sale of GuestHouse to Settle Inn, as required by Sections 4.8 and 6.5 of the License Agreement," thereby providing another basis on which to terminate the agreement under Section 7.1. Therefore, based on its rescission and termination of the Amended and Restated License Agreement, New Shoney's demanded that Guest-House discontinue all use of the Shoney's Inn marks.

### Lawsuit Filed

Three days later, on August 20, 2007, GuestHouse filed this lawsuit against both New Shoney's and Old Shoney's.[24] In the complaint, GuestHouse asserted: (1) violation of the Tennessee Consumer Protection Act; (2) breach of the Amended and Restated License Agreement; and (3) tortious interference with prospective business relations with potential Shoney's Inn franchisees. It also requested a declaration of GuestHouse's rights under the Amended and Restated License Agreement. GuestHouse sought injunctive relief to enjoin New Shoney's from interfering with GuestHouse's efforts to franchise new Shoney's Inn motels, and alternative relief (later amended to "restitution") seeking the return of the $5.25 million that Guest-House's predecessor in interest paid to acquire the licensing rights to the Shoney's Inn service marks.[25] GuestHouse claimed that Old Shoney's was essentially secondarily liable as the predecessor-in-interest of New Shoney's with respect to the Amended and Restated License Agree-

---

**23.** Section 7.1 of the Amended and Restated License Agreement permitted New Shoney's to terminate the agreement if GuestHouse "[f]ail[ed] to perform any of the terms and conditions contained in this Agreement," or if it "[c]ommit[ted] any acts of fraud or intentional misrepresentation with respect to the activities relating to any of the Licensed Marks...."

**24.** Specifically, the lawsuit was filed against Shoney's North America Corp. and Sholand, LLC.

**25.** On July 18, 2008, GuestHouse filed an amended complaint that included a claim for restitution in the amount of $5.25 million, the lump sum that ShoLodge paid Old Shoney's in lieu of all future royalties on use of the Shoney's Inn service marks under the 1991 Original License Agreement. In a revised supplemental response to interrogatories, New Shoney's stated that it intended to submit evidence on an alternative basis for recovery, claiming $3 million as the alleged value of its rights as a licensee under the Amended and Restated License Agreement at the time that New Shoney's termination letter was sent.

ment. GuestHouse also claimed that Old Shoney's, in executing the Consent and Estoppel Agreement, made representations upon which GuestHouse relied, namely, its reaffirmation of the validity of the Amended and Restated License Agreement. GuestHouse also filed a separate motion for a temporary injunction, seeking to enjoin New Shoney's from interfering with GuestHouse's Shoney's Inn franchise system or operations. Specifically, GuestHouse sought to continue to use the Shoney's Inn service marks to operate the Shoney's Inns that remained in existence, and to be permitted to franchise additional Shoney's Inn motels pending resolution of the lawsuit.

On September 21, 2007, New Shoney's filed its answer and counterclaims that were essentially the "flip-side" of GuestHouse's claims. New Shoney's asserted counterclaims based on: (1) federal trademark infringement and false designation of origin; (2) state common law trademark infringement and unfair competition; (3) violation of the Tennessee Consumer Protection Act; (4) breach of the Amended and Restated License Agreement by GuestHouse's continued use of the Shoney's Inn marks after termination of the license agreement and by its actions in seeking to use the service marks to open additional Shoney's Inn motels; (5) intentional misrepresentation/fraudulent inducement/fraudulent concealment; and (6) negligent misrepresentation. Like Guest-

House, New Shoney's sought a declaration of the parties' rights under the Amended and Restated License Agreement.

Old Shoney's (Sholand LLC) filed an answer that was generally consistent with the answer filed by New Shoney's, but it also denied assignor liability for any restitution of the lump-sum payment. Old Shoney's did not file a counter-complaint.

On September 25, 2007, the trial court held a hearing on GuestHouse's motion for a temporary injunction.[26] At the conclusion of the hearing, the trial court granted in part and denied in part GuestHouse's request. It enjoined New Shoney's from interfering with GuestHouse's operations of existing Shoney's Inn motels (there were three at the time). The trial court, however, refused to grant injunctive relief to GuestHouse as to potential New Shoney's Inn franchisees.[27] After entry of a consent protective order to safeguard confidential business information, extensive discovery ensued.

### Cross–Motions for Summary Judgment

After discovery was essentially concluded, on August 8, 2008, several summary judgment motions were filed. GuestHouse filed a motion for partial summary judgment in which it argued that New Shoney's had no basis for its termination and rescission of the Amended and Restated

**26.** On August 24, 2007, New Shoney's removed the case to federal court. The case was subsequently remanded to state court for lack of federal jurisdiction. Upon remand, GuestHouse renewed its motion for a temporary injunction.

**27.** On October 9, 2007, GuestHouse moved to dismiss the counterclaims filed by New Shoney's on the grounds that the Amended and Restated License Agreement was valid and enforceable as a matter of law. On November 19, 2007, the trial court denied that mo-

tion. A few days prior to the trial court's denial of the motion to dismiss, on November 16, 2007, GuestHouse filed an initial motion for partial summary judgment on grounds that were virtually identical to those raised in its motion to dismiss, again arguing that the facts were undisputed and that the Amended and Restated License Agreement was valid and enforceable as a matter of law. On January 2, 2008, the trial court denied this motion as well.

Agreement.[28] GuestHouse claimed that (1) the Amended and Restated License Agreement was supported by consideration; (2) neither ShoLodge nor Guest-House had waived the license to use the service marks; and (3) there was no fraudulent misrepresentation or omission by GuestHouse because it had no duty to disclose its intent to expand the Shoney's Inn franchises at the time Old Shoney's executed the Consent and Estoppel Agreement. GuestHouse contended that, in light of the wrongful rescission by New Shoney's, as a matter of law, it was entitled to restitution from New Shoney's and/or Old Shoney's, in the form of repayment of the $5.25 million lump sum paid in 1996 for the license to use the Shoney's Inn service marks.

New Shoney's filed a cross-motion for summary judgment, seeking judgment in its favor on all of GuestHouse's claims and seeking partial summary judgment on its counterclaims for breach of contract, declaratory judgment, trademark infringement, unfair competition, and violation of the Consumer Protection Act. New Shoney's maintained that GuestHouse had no valid claim to the license to use the Shoney's Inn service marks because (1) the Amended and Restated License Agreement was not supported by consideration to Old Shoney's in exchange for the license; (2) ShoLodge, GuestHouse's predecessor, waived its right to the license by its statements and actions showing intent to cease using it; and (3) when Old Shoney's was asked to execute the Consent and Estoppel Agreement, GuestHouse had a duty to disclose to Old Shoney's its intent to begin franchising new Shoney's Inn motels and committed fraud by failing to do so. New Shoney's contended that, even if

the license had been wrongfully terminated, GuestHouse was not entitled to restitution because GuestHouse was seeking to reaffirm the license agreement and because the requirements for restitution were not met.

Likewise, Old Shoney's filed a cross-motion for summary judgment. It argued that it had no liability to GuestHouse because (1) there was no consideration for the Consent and Estoppel Agreement executed by Old Shoney's and, thus, Old Shoney's could not be found in breach of it; (2) GuestHouse did not detrimentally rely on the Consent and Estoppel Agreement; and (3) GuestHouse was not entitled to restitution because the parties could not be returned to *status quo ante.*

Thus, the primary issues raised in all of the parties' motions centered on whether the 2000 Amended and Restated License Agreement and the 2006 Consent and Estoppel Agreement were valid and, alternatively, whether ShoLodge, as Guest-House's predecessor, had waived its right to use the Shoney's Inn service marks under the Amended and Restated License Agreement.

### Trial Court Decision

On September 19, 2008, the trial court conducted a hearing on the parties' respective motions for summary judgment. The trial court carefully reviewed the parties' memoranda and examined thousands of pages of exhibits and other filings presented by the parties in support of their arguments. On October 23, 2008, the trial court entered a comprehensive memorandum opinion addressing all of the parties' motions. In sum, the trial court denied GuestHouse's motion for partial summary

28. This second motion for partial summary judgment was similar to the first in footnote

27 above.

judgment, granted the New Shoney's motion for summary judgment as to the complaint filed by GuestHouse, and granted in part and denied in part the New Shoney's motion for summary judgment on its counter-claims against GuestHouse.

In reaching its conclusion, the trial court made fifty-six enumerated findings of fact, as well as other more general findings. The facts deemed by the trial court to be material and undisputed are summarized below: [29]

1. The Amended and Restated License Agreement replaced and superceded the 1991 Original License Agreement and the amendments thereto;

2. From the execution of the Amended and Restated License Agreement through 2002, ShoLodge had little or no success in selling new Shoney's Inn motels franchises;

3. When ShoLodge acquired rights to the existing GuestHouse hotel brand in May 2002, it made the conscious and informed decision to convert all existing Shoney's Inn motels to the GuestHouse brand, and it also decided that no more attempts would be made to franchise the Shoney's Inn brand in the future;

4. ShoLodge made numerous public representations indicating that it had decided to convert all existing Shoney's Inn motels to GuestHouse hotels, and that it did not intend to franchise the Shoney's Inn brand in the future;

5. Such public representations were made in ShoLodge's August 2002 report to its Board of Directors, in a May 21, 2002 press release entitled, "ShoLodge Announces Name Conversion of Shoney's Inns to GuestHouse Inn and Suites;" in ShoLodge's 2002 Form 10–K and Form 10–K/A Annual Reports filed with the SEC; in its letter to shareholders in the 2002 and 2003 Shareholder Annual Reports; in 2002 letters to existing franchisees asking all of them to convert their Shoney's Inn motels to the GuestHouse brand; and in a letter from ShoLodge's Executive Grout to COO of Old Shoney's informing him that the franchise owners voted to make the conversion to GuestHouse by the first quarter of 2003;

6. In 2002, ShoLodge took an accounting write-off of all of the $6.4 million value of the intangible assets associated with the Shoney's Inn service marks based on its decision that no Shoney's Inn franchises would be sold in the future and its determination that those assets no longer had value and were "worthless;"

7. ShoLodge made no attempts to sell Shoney's Inn franchises between 2002 and 2006;

8. The 70 Shoney's Inn motels operating at the end of 2001 declined to 45 by the end of 2002, to 18 by the end of 2003, to 7 by the end of 2004, to 5 by the end of 2005, and to 4 by the end of 2006;

9. Settle Inn/GuestHouse was aware of ShoLodge's decision and course of conduct in phasing out the Shoney's Inn brand and ceasing efforts to franchise Shoney's Inn motels;

10. The asset purchase agreement between ShoLodge and GuestHouse included the "special condition," indicating that whether consent to assign the Amended and Restated License Agreement was given by Old Shoney's was not material to the purchase price of the sale;

---

**29.** We discuss the trial court's findings in more detail in the analysis of the issues raised on appeal.

11. On November 15, 2006, ShoLodge's Jim Grout sent an email to Old Shoney's Habermann to seek consent to the assignment of the Amended and Restated License Agreement to GuestHouse, and he indicated that the assignment was to permit ShoLodge to transfer the five remaining Shoney's Inns to GuestHouse; he did not indicate that GuestHouse intended to relaunch the Shoney's Inn brand;

12. At the time consent was being sought from Old Shoney's on behalf of GuestHouse, GuestHouse knew that it wanted to reintroduce and relaunch franchising of the Shoney's Inn brand, but did not disclose this fact;

13. Old Shoney's signed the 2006 Consent and Estoppel Agreement, consenting to the assignment to GuestHouse in reliance on its understanding that the Shoney's Inn brand was being phased out, and that the few remaining Shoney's Inn franchise motels would continue to be operated, but that there would be no franchising of new Shoney's Inn motels;

14. If GuestHouse had indicated to Old Shoney's that it intended to begin opening or franchising new Shoney's Inn franchise motels, that information would have differed significantly from the understanding and expectations Old Shoney's had regarding the direction of the Shoney's Inn franchise; this information would have been important to Old Shoney's in connection with deciding whether to consent to the assignment;

15. The Consent and Estoppel Agreement is listed as a material contract in the Asset Purchase Agreement between Old Shoney's and New Shoney's;

16. GuestHouse first disclosed its intention to begin franchising new Shoney's Inn motels in June 2007;

17. New Shoney's sent a letter to GuestHouse purporting to terminate the Amended and Restated License Agreement on August 17, 2007;

18. The Amended and Restated License Agreement does not contain a provision for payments to the Licensor in exchange for the Licensee's use of the Licensor's Shoney's Inn service marks.

Based on these undisputed facts, the trial court concluded that, as a matter of law, there was no consideration for either the Consent and Estoppel Agreement or the Amended and Restated License Agreement. Regarding the Consent and Estoppel Agreement, the trial court found that "[t]here was no detrimental reliance by GuestHouse; no detriment by assuming the [Amended and Restated] License Agreement was suffered by GuestHouse. The Consent and Estoppel Agreement did not require either ShoLodge or Guest-House to take any action they were not already legally obligated to take." Regarding the Amended and Restated License Agreement, the trial court held that it "provides for no payment or royalties to the Licensor, [New Shoney's], in exchange for the Licensee's use of [the New Shoney's] SHONEY'S INN Marks." The trial court rejected GuestHouse's argument that the $5.25 million lump-sum payment constituted consideration, stating that "[p]erformance of a preexisting obligation affords no consideration at law." Reasoning that the Amended and Restated License Agreement replaced and superceded the 1991 Original License Agreement, the trial court held that no consideration existed for the Amended and Restated License Agreement, because the "[p]erformance of a contracted duty or promise in the past is not consideration for a new agreement."

The trial court further concluded that, even if there were consideration for the Amended and Restated License Agree-

ment, ShoLodge waived the right to franchise additional Shoney's Inn motels based on its course of conduct:

> If this court is in error by its finding of no consideration, it is the finding that ShoLodge waived the right to franchise additional Shoney's Inn motels by its declarations and course of conduct in phasing out the Shoney's Inn brand and private and public announcement that no additional Shoney's Inn motels would be franchised in the future.
>
> In 2002, ShoLodge made the conscious and informed decisions to phase out and close out the Shoney's Inn brand and that there would be no franchising of Shoney's Inn motels in the future. From this decision in 2002 through 200[6] ShoLodge unequivocally declared no more Shoney's Inns to its shareholders, to its franchisees, to the public in general by press release, to [Old Shoney's], the Licensor under the 2000 Lease Agreement and to the U.S. Securities and Exchange Commission. ShoLodge converted its Shoney's Inn motels to the GuestHouse name and encouraged franchisees to do the same. There was no attempt by ShoLodge to franchise Shoney's Inns.
>
> When Brendan Watters, CEO of Settle Inn, negotiated with ShoLodge in the later part of 2006, there were four Shoney's Inns remaining. Those four were thrown into the deal by ShoLodge with no additional money to be paid. ShoLodge insisted that the deal include the four remaining Shoney's Inns.
>
> A "waiver is a voluntary relinquishment by a party of a known right. It may be proved by express declaration; or by acts and declarations manifesting an intent and purpose not to claim the supposed advantage." *Chattem, Inc. v. Provident Life and Accident, Ins. Co.,* 676 S.W.2d 953, 955 (Tenn.1984).

> Once a party has waived rights, it cannot revoke the waiver. *Henley Supply Co.,* 1984 Tenn.App. LEXIS 260. Brendan Watters knew that ShoLodge had converted from Shoney's Inn to GuestHouse.
>
> [Old Shoney's] relied on the understanding that there would be no franchising of new Shoney's Inn motels when it signed the Consent and Estoppel Agreement.

The trial court thus held that ShoLodge had waived the right to franchise additional Shoney's Inn motels and, therefore, could not assign this right to GuestHouse.

The trial court also held that New Shoney's was entitled to summary judgment on Count 6 of GuestHouse's complaint for restitution in the amount of the $5.25 million lump sum paid by ShoLodge to Old Shoney's in 1996 pursuant to the fifth amendment of the 1991 Original License Agreement. The trial court noted that the remedy of restitution is intended to restore the parties to their positions prior to the execution of the contract at issue. The trial court said that it would be "impossible for GuestHouse to make a return of the use of the Shoney's Inn Marks," and that "[t]he parties cannot be returned to the status quo ante." The trial court also found restitution unavailable to GuestHouse based on the inconsistency in GuestHouse's request to both *enforce* the Amended and Restated License Agreement (seeking an injunction) and *renounce* the agreement (seeking restitution), observing that "GuestHouse seeks to use the Shoney's Inn Marks and wants return of the lump sum payment for that right."

Thus, the trial court granted judgment in favor of New Shoney's on all six counts of GuestHouse's amended complaint, and on the following counts of the New Shoney's counter-complaint: count 1 (federal trademark infringement and false

designation of origin); count 2 (state common law trademark infringement and unfair competition); count 4 (breach of the Amended and Restated License Agreement); and count 5 (declaratory relief). It denied the New Shoney's motion for summary judgment as to counts 3 (Consumer Protection Act), 6 (intentional misrepresentation/fraudulent inducement/fraudulent concealment), and 7 (negligent misrepresentation) of the counterclaim, finding that material issues of fact existed as to those counts. In its October 2008 memorandum opinion, the trial court did not separately address the issues raised in the Old Shoney's motion for summary judgment, although it appears that the positions taken by Old Shoney's and New Shoney's were aligned at all times.

On October 24, 2008, GuestHouse filed a motion for the trial court to certify its decision as final under Rule 54.02 of the Tennessee Rules of Civil Procedure. On November 4, 2008, the trial court entered an order granting this motion, stating that "[t]he Court's Order dismissing [Guest House's] claims is hereby certified as a final judgment." Thus, the trial court certified as final only its dismissal of GuestHouse's complaint as challenged in the New Shoney's motion for summary judgment, not its rulings related to the New Shoney's counterclaims. The trial court granted GuestHouse's motion to continue the trial on the remainder of the claims until resolution of this appeal and remand of the case back to the trial court.

On November 7, 2008, the trial court entered an order confirming the rulings in its memorandum opinion. In addition, it granted the motion for summary judgment

filed by Old Shoney's. The trial court also granted the following declaratory relief:

1. [T]he [Amended and Restated] License Agreement is unenforceable for lack of consideration;

2. [A]ccordingly, New Shoney's properly rescinded or terminated the [Amended and Restated] License Agreement by letter dated August 17, 2007, such that GuestHouse has no further rights to use the Shoney's Inn Marks;

3.[T]he December 1, 2006 Consent and Estoppel "Agreement" is not an enforceable contract because it lacks consideration; the statements in Paragraph 2 thereof are unenforceable for lack of consideration; and there was no detrimental reliance by [GuestHouse] thereon;

4. GuestHouse's predecessor, Sho-Lodge, waived and relinquished any right that may have existed under the [Amended and Restated] License Agreement to open, franchise or develop additional Shoney's Inn motels.

The trial court also granted the request of New Shoney's for injunctive relief on its trademark infringement claims, and it dissolved the temporary injunction entered in September 2007 in favor of GuestHouse. *See* 15 U.S.C. § 1116(a). The trial court chose not to permanently enjoin GuestHouse from using the Shoney's Inn service marks at that juncture.[30] GuestHouse now appeals the issues certified for appeal in the trial court's November 4, 2008 order.

### ISSUES ON APPEAL AND STANDARD OF REVIEW

On appeal, GuestHouse argues that the trial court erred in dismissing its complaint in its entirety, and in granting summary judgment in favor of New Shoney's.

---

30. At oral argument, the parties indicated that, despite the trial court's ruling, GuestHouse continues to use the Shoney's Inn service marks to operate the two remaining Shoney's Inn motels.

As it argued to the trial court below, GuestHouse contends:

1. The Amended and Restated License Agreement was supported by adequate consideration;

2. The Consent and Estoppel Agreement was supported by consideration;

3. ShoLodge waived no rights under the Amended and Restated License Agreement;

4. GuestHouse was entitled to summary judgment because the termination of the Amended and Restated License Agreement was improper;

5. GuestHouse is entitled to recover as restitution the $5.25 million lump sum paid, plus pre-judgment interest.

In response, New Shoney's argues that the Amended and Restated License Agreement was unenforceable for lack of consideration and, therefore, that the trial court correctly held that New Shoney's properly terminated it. This holding, New Shoney's asserts, entitles it to summary judgment on all of GuestHouse's claims and on most of the counterclaims filed by New Shoney's, including the counter-claims under the Consumer Protection Act. Alternatively, New Shoney's claims that, even if this Court determines that the Amended and Restated License Agreement was supported by consideration, the termination of that agreement by New Shoney's was permissible based on GuestHouse's fraud or misrepresentation in procuring Old Shoney's consent to the 2006 assignment of the license to use the Shoney's Inn service marks without disclosing its intention to resume franchising Shoney's Inn motels. New Shoney's maintains that the trial court properly held that GuestHouse is, in any event, not entitled to restitution. Apart from the contract issues, New Shoney's argues that it is entitled to summary judgment on GuestHouse's claims alleging violation of the Consumer Protection Act

and tortious interference with prospective business contract because, among other things, GuestHouse has not shown that any act by New Shoney's can be characterized as "unfair" or "deceptive." New Shoney's also insists that the trial court erred in refusing to permanently enjoin GuestHouse from using the Shoney's Inn service marks.

Old Shoney's joins New Shoney's in arguing that the trial court's decision should be affirmed. Specifically, Old Shoney's argues that the trial court correctly held that Old Shoney's has no liability arising out of its statements in the Consent and Estoppel Agreement because (1) the Consent and Estoppel Agreement lacks mutual consideration and is not an enforceable contract, and (2) there was no detrimental reliance on the Old Shoney's statements in the Consent and Estoppel Agreement, in that GuestHouse did not demonstrate that it relied on the statements and, even if it did, GuestHouse did not demonstrate that it suffered any detriment from its purported reliance on the statements. Old Shoney's also contends that the trial court's holding that GuestHouse cannot enforce the Amended and Restated License Agreement against Old Shoney's should be affirmed because (1) the agreement lacks mutual consideration, (2) GuestHouse waived its rights under the agreement, (3) GuestHouse is not entitled to restitution, (4) Old Shoney's is not liable as an assignor under the Amended and Restated License Agreement, and (5) GuestHouse waived its right to hold Old Shoney's responsible for the performance of New Shoney's under the Amended and Restated License Agreement.

■ We review the trial court's grant of summary judgment *de novo* on the record, with no deference afforded the decision of the trial court. *U.T. Med. Group, Inc. v. Vogt,* 235 S.W.3d 110, 119 (Tenn.

2007). Summary judgment may be granted when no genuine issue of material fact exists, and the moving party is entitled to a judgment as a matter of law. *See Hannan v. Alltel Pub'g Co.*, 270 S.W.3d 1, 5 (Tenn.2008); *Byrd v. Hall*, 847 S.W.2d 208, 214 (Tenn.1993); Tenn. R. Civ. P. 56.04. A mere scintilla of evidence in support of a nonparty's position is insufficient to defeat an otherwise proper motion for summary judgment. *Byrd*, 847 S.W.2d at 212.

## ANALYSIS

We reiterate that, in its order, the trial court granted summary judgment in favor of New Shoney's on all counts in Guest-House's amended complaint. This portion of the trial court's order was made final under Rule 54.02 of the Tennessee Rules of Civil Procedure. The trial court's grant of partial summary judgment to New Shoney's on some, but not all, counts of its counter-complaint was not made final and is not before us on appeal. We are mindful, however, that, to the extent that the New Shoney's counter-claims are the "flip-side" of GuestHouse's claims, they may be impacted by our holdings. Likewise, the trial court's grant of summary judgment in favor of Old Shoney's was not certified as final, but will be impacted as well.[31]

We first address the trial court's holding that New Shoney's properly terminated the Amended and Restated License Agreement on the three bases stated in New Shoney's termination letter: (1) lack of consideration; (2) fraud or misrepresentation by GuestHouse in obtaining Old Shoney's consent in the execution of the Consent and Estoppel Agreement; and (3) the failure of GuestHouse or ShoLodge to obtain the required written approval for

"ShoLodge's sale of GuestHouse to Settle Inn." We will then analyze whether Sho-Lodge, and thus GuestHouse, waived the right to franchise new Shoney's Inn motels. After that, we will discuss Guest-House's Consumer Protect Act and tortious interference claims, and the trial court's dismissal of GuestHouse's claim for restitution and other remedies for breach. Finally, we will address the issues raised by Old Shoney's on appeal.

## Termination of Amended and Restated License Agreement

### 1. Consideration

The trial court held that the Amended and Restated License Agreement was unenforceable from its inception because it was not supported by consideration. The trial court's analysis of this issue was concise. It held simply that "[t]he [Amended and Restated] License Agreement provides for no payment or royalties to the Licensor [New Shoney's], in exchange for the Licensee's [GuestHouse predecessor ShoLodge] use of [New Shoney's] SHONEY'S INN Marks." The trial court specifically rejected GuestHouse's argument that the 1996 lump-sum payment of $5.25 million constituted consideration for the use of the license for the service marks. It recited that neither "[p]erformance of a pre-existing obligation" nor "[p]erformance of a contracted duty or promise in the past" can be consideration for a new agreement. The trial court stated that the Amended and Restated License Agreement "replaced and superceded the 1991 [Original] License Agreement."

The parties' arguments are not as concise as the trial court's ruling on this is-

---

31. The trial court's November 7, 2008 order granting the Old Shoney's motion for summary judgment was entered three days after the trial court certified as final its decision dismissing GuestHouse's complaint based on the New's Shoney's motion for summary judgment.

sue. On appeal, GuestHouse argues that the trial court erred because consideration for the Amended and Restated License Agreement clearly existed for a number of reasons. It first points out that the agreement itself recites that it was based on adequate consideration. Citing Nevada law, GuestHouse claims that extrinsic evidence is not admissible to contradict a recital clause in a contract. *See County of Clark v. Bonanza No. 1*, 96 Nev. 643, 615 P.2d 939, 944 (1980).[32] GuestHouse also notes that the Amended and Restated License Agreement altered the parties' existing legal relationship in two respects: it permitted certain Shoney's Inns to operate non-Shoney's restaurants inside the motel, and it deleted a warranty that Old Shoney's had made to ShoLodge in the original license agreement.[33] GuestHouse contends that the first alteration was supported by consideration because it benefitted Old Shoney's by (1) removing a competitive obstacle to the growth and success of the Shoney's Inn chain, which in turn created a wider distribution of the Shoney's name and service marks, thus benefitting both ShoLodge and Old Shoney's, and (2) mitigating the likelihood that ShoLodge would sue Old Shoney's to recover for damages caused by the closure of numerous Shoney's restaurants.[34] Old Sho-

ney's also benefitted from the deletion of the warranty, GuestHouse contends, because it relieved Old Shoney's of the obligation to attest to the validity of the registered marks.

GuestHouse also argues that the Amended and Restated License Agreement was supported by consideration because the agreement imposed a detriment on ShoLodge, and such a detriment constitutes legal consideration for a contract. GuestHouse notes that, in Section 4.3(d)(1) of the agreement, ShoLodge agreed to display a disclaimer plaque in the new non-Shoney's restaurants in order to avoid the appearance that the motel's restaurant was affiliated with Shoney's brand restaurants. GuestHouse claims that this promise was made in exchange for the Old Shoney's agreement to permit a non-Shoney's restaurant in certain Shoney's Inns. Such an exchange of promises, GuestHouse argues, provides consideration for the overall contract.

Lastly, GuestHouse points to three contractual recitations by Old Shoney's and New Shoney's acknowledging that the Amended and Restated License Agreement is a valid and binding agreement that is supported by consideration. The first

**32.** We note that the Amended and Restated License Agreement states that it is to be construed in accordance with Nevada law, despite the fact that the parties were not Nevada corporations. From the appellate briefs and the record, it appears that the only issue on which there may be some difference between Tennessee caselaw and Nevada caselaw is on whether extrinsic evidence is admissible to contradict a recital of consideration in a contract. Thus, on all other issues in this appeal, we will analyze the arguments under Tennessee law.

**33.** The warranty in the 1991 Original License Agreement provided that there were "no claims, demands or proceedings instituted, pending or, to the knowledge of the Licensor,

threatened by any third party pertaining to or challenging any right to use the Licensed Mark. As of the date of this Agreement, to the knowledge of Licensor, there are no facts which would render the Licensed Mark invalid or unenforceable." This provision was omitted from the Amended and Restated License Agreement.

**34.** GuestHouse cites the deposition testimony of the corporate counsel for Old Shoney's, Ted Habermann, in which he testified that, in return for permitting ShoLodge to put a non-Shoney's restaurant inside certain hotels, ShoLodge "didn't take any further actions against old Shoney's for what they had done in reference to close-up of restaurants."

recitation is in the Amended and Restated License Agreement itself; the second is in the Consent and Estoppel Agreement; and the third is in the asset purchase agreement between Old Shoney's and New Shoney's, which listed the Amended and Restated License Agreement among the valid contracts that were material to the transaction. In light of these representations and agreements, particularly in light of the fact that the contracting parties acknowledged the validity of this agreement and operated under it for several years, GuestHouse argues, New Shoney's cannot now prevail in its position that the new agreement was not supported by consideration.

In response, New Shoney's argues that the trial court's holding should be affirmed. The trial court correctly observed, New Shoney's notes, that the Amended and Restated License Agreement provided for no royalties, payments, or other benefit to Old Shoney's in exchange for ShoLodge's right to use the Shoney's Inn service marks in the motel industry on a nationwide basis and for an indefinite term that would extend until "the expiration of the last license agreement entered into between [ShoLodge] and any of its franchisees for the operation of [Shoney's Inn] Motels." New Shoney's contends that the trial court correctly rejected GuestHouse's argument that the $5.25 million lump-sum payment for the license made in 1996 constitutes consideration, because past consideration is not valid to support a subsequent contract. *See Bratton v. Bratton*, 136 S.W.3d 595, 604 (Tenn.2004).

New Shoney's further argues that GuestHouse's other arguments for consideration are also without merit. Initially, it maintains that the recital clause in the Amended and Restated License Agreement, reciting the existence of consider-

ation, is not conclusive on the issue. *Id.* at 602–03. It also claims that GuestHouse is fundamentally incorrect in asserting that the Amended and Restated License Agreement is merely a modification of the 1991 Original License Agreement, and that separate consideration is not required. Rather, it contends, the new agreement is separate and superceded the original agreement and, therefore, consideration for the entire agreement must exist in order for the agreement to be enforceable.

Even if consideration were required only for the two alterations made in the new agreement, New Shoney's argues, the new agreement would still fail for lack of consideration. New Shoney's claims that Old Shoney's received no benefit from permitting ShoLodge and its franchisees to operate restaurants in the Shoney's Inn motels. No evidence suggested that the agreement was reached in exchange for ShoLodge decision to forego filing a lawsuit based on the closing of Shoney's restaurants; in any event, ShoLodge could not have asserted a valid claim on this basis because there were no contractual provisions to preclude Old Shoney's from closing restaurants. Therefore, New Shoney's contends, avoiding litigation was not a "benefit" received by Old Shoney's in permitting the amendment to the agreement. New Shoney's also claims that the "plaque" requirement was not a detriment to ShoLodge because, even absent such a contractual requirement, ShoLodge would have been obligated to display such a notice to prevent confusion and infringement on Shoney's Inn service marks. Finally, New Shoney's argues that the deletion of the "no-infringement" clause in the Amended and Restated License Agreement did not constitute a benefit to Old Shoney's, because the Agreement includes a provision in which Old Shoney's makes the same sub-

stantive representation.[35] Thus, the deletion of the "no-infringement" clause conferred no benefit on Old Shoney's and, therefore, was not consideration for the Amended and Restated License Agreement.

■ We begin our analysis of this issue with an overview of the law on consideration. Generally, "consideration for a contract may be either a benefit to the promisor or a detriment to, or an obligation upon, the promisee." *Id.* at 602. If a contract does not have valid, mutual consideration, it is invalid and unenforceable. *Id.* at 603–04. One reason consideration is required as an element of a contract is to prevent the enforcement of gratuitous promises:

> It is said that when one receives a naked promise and such promise is broken, he is not worse off than he was; he gave nothing for it, he has lost nothing by it, and on its breach he has suffered no damage cognizable by courts. No benefit accrued to him who made the promise, nor was any injury sustained by him who received it.

*Allman v. Boner,* No. 01A01–9306–CH–00270, 1993 WL 541111, at *2 (Tenn.Ct. App. Dec.29, 1993) (citing 17A Am.Jur.2d *Contracts* § 114 (1991)). As a general rule, consideration must be measured at the time the parties enter into their contract and, thus, the diminished value of the economic benefit conferred, or even a complete lack of value after the parties enter into the contract, does not result in the failure of consideration. 17A Am.Jur.2d *Contracts* § 114 (Supp.2008) (citing *Wein-*

*stein v. KLT Telecom, Inc.,* 225 S.W.3d 413 (Mo.2007)).

■ "Any consideration, however small, will support a promise." *Smith v. Riley,* No. E2001–00828–COA–R3–CV, 2002 WL 122917, at *3 (Tenn.Ct.App. Jan.30, 2002) (quoting *Danheiser v. Germania Savs. Bank & Trust Co.,* 137 Tenn. 650, 194 S.W. 1094, 1096 (1917)). Courts "will not inquire into the adequacy or inadequacy of the consideration for a compromise fairly and deliberately made." *Canonie Energy, Inc. v. King,* No. 03A01–9506–CH–00200, 1996 WL 87440, at *6 (Tenn.Ct. App. Mar.1, 1996) (quoting *Thurmond v. Whittaker,* 1 Tenn.App. 111 (1925)). "It is well-settled that consideration exists when the promisee does something that it is under no legal obligation to do or refrains from doing something which it has a legal right to do." *Brown Oil Co. v. Johnson,* 689 S.W.2d 149, 151 (Tenn.1985); *Pearson v. Garrett Fin. Servs., Inc.,* 849 S.W.2d 776, 779 (Tenn.Ct.App.1992). "For there to be consideration in a contract between parties to the contract it is not necessary that something concrete and tangible move from one to the other. Any benefit to one and detriment to the other may be a sufficient consideration." *Walker v. First State Bank,* 849 S.W.2d 337, 342 (Tenn.Ct. App.1992) (citing *Palmer v. Dehn,* 29 Tenn.App. 597, 198 S.W.2d 827, 828 (1946)).

■ In determining whether an agreement is supported by consideration, we view the agreement in its entirety, "not as separate, unrelated sets of promises." *Anesthesia Med. Group, P.C. v. Chandler,* No. M2005–00034–COA–R3–CV, 2007 WL

---

**35.** Section 2.1 of the Amended and Restated License Agreement, which was also included in the 1991 Original License Agreement, states: "[Old Shoney's] owns the Licensed Marks free and clear of all liens, security interests, encumbrances, claims, ownership interest, pledges charges or interest of any kind, whether voluntarily incurred or arising by operation of law or otherwise.... [N]o other person has the right to use the Licensed Marks."

412323, at *6 (Tenn.Ct.App. Feb.6, 2007). "If a contract is in writing and signed by the party sought to be bound, such is *prima facie* evidence of consideration. . . . The burden to overcome this presumption is on the party asserting lack of consideration." *Toliver v. Wall*, No. M2006–00910–COA–R3–CV, 2007 WL 1890648, at *2 (Tenn.Ct.App. June 28, 2007).

 It is axiomatic that, in reviewing the Amended and Restated License Agreement, this Court must consider the surrounding circumstances at the time it was executed and seek to place ourselves "in the situation occupied by the parties when the agreement was made." 17A Am. Jur.2d *Contracts* § 351, at 339; *see also* RESTATEMENT (SECOND) CONTRACTS, § 202(1) (1981). The trial court found that the Amended and Restated License Agreement was intended to replace and supercede the 1991 Original License Agreement and its amendments, and the parties do not dispute this. However, the Amended and Restated License Agreement does not in fact state that it is intended to rescind the prior agreements. The Amended and Restated License Agreement recognizes expressly that it arose from the parties' original license agreement, as amended. New Shoney's implicitly acknowledges that the original agreement and its amendments are relevant by directing the Court's attention to the fact that the vast majority of the reciprocal rights and duties set out in the eighteen-page Amended and Restated License Agreement are not new, but are the same rights and duties outlined in the prior agreement as amended. Therefore, the existence of the original license agreement and its amendments remain part of the circumstances surrounding the new agreement at the time it was executed.

As noted above, the 1991 Original License Agreement was mutually beneficial to both parties for many reasons. Originally, the exchange of benefits included ShoLodge's promise to pay Old Shoney's royalties in exchange for the license to use the Shoney's Inn service marks. In 1996, to accommodate the financial needs of Old Shoney's, the parties modified the royalties provision by requiring ShoLodge to pay $5.25 million to Old Shoney's in lieu of all future royalties, expressly stating that "the termination of the royalty payment obligation created by this Amendment" pertained to all "future royalties accruing after the date of this Amendment." Thus, by paying Old Shoney's the $5.25 million lump sum, ShoLodge in effect purchased the "termination of the royalty payment obligation" as to the license for the Shoney's Inn service marks for the duration of the agreement.

This, then, was the status of ShoLodge's licensure when the Amended and Restated License Agreement was executed. As suggested by the title of the document, and as stated expressly in the body of it, the Amended and Restated License Agreement "amends" some aspects of the parties' licensure arrangement and "restates" others. Repeating the same language used in the 1991 Original License Agreement, the Amended and Restated License Agreement "restates" that it grants Sho-Lodge a non-exclusive right and license to use the Shoney's Inn service marks, and likewise repeats the rights and obligations of Old Shoney's and ShoLodge, as set forth in the original agreement and in the ensuing amendments. These include, for example, restrictions on the style, shape, and color of the Shoney's Inn service marks to be used by Shoney's Inn franchisees, and express permission for Old Shoney's to inspect the premises of all franchised motels. The agreement does not include the prior provisions related to the payment of royalties. The reason for this

is obvious. In 1996, ShoLodge had purchased the "termination of the [future] royalty payment obligation," at no small price. Nothing in the record or in the language of the document suggests an intent to modify the parties' arrangement in this regard. Thus, the Amended and Restated License Agreement simply "restates" the agreement that existed at the time with respect to ShoLodge's license to use the Shoney's Inn service marks.

The new agreement "amends" the old agreement in at least two ways: (1) permitting non-Shoney's restaurants to operate inside Shoney's Inn motels, and requiring disclaimer plaques therein, and (2) omitting the "no-infringement" clause from the new agreement. These amendments enabled the parties to continue their mutually beneficial contractual relationship, as is apparent from the continued course of dealing between Old Shoney's and ShoLodge after execution of the new agreement. There is no evidence in the record indicating that, during the six years after the execution of the Amended and Restated License Agreement, Old Shoney's ever protested ShoLodge's continued use of the Shoney's Inn service marks.

The issue becomes whether, under these circumstances, the Amended and Restated License Agreement was supported by adequate consideration. The Amended and Restated License Agreement is in part a modification of the pre-existing contractual relationship between ShoLodge and Old Shoney's. Therefore, we consider the law on consideration as it relates to contract modification for purposes of determining whether sufficient consideration existed to support the Amended and Restated License Agreement in this case.

■■■ The modification of an existing contract requires the consent of both parties. *See E & A Ne. Ltd. P'ship v. Music City Record Distribs., Inc.*, No. M2005–01207–COA–R3–CV, 2007 WL 858779, at *4 (Tenn.Ct.App. Mar.21, 2007). However, "[c]ontract modifications can present consideration issues." 21 STEVEN W. FELDMAN, TENN. PRAC. SERIES CONTRACT LAW AND PRACTICE § 5:21 (Supp.2009) (hereinafter "TENN. CONTRACT LAW AND PRAC."). In general, under the common law, the modification of an existing agreement must be supported by reciprocal consideration, that is, each party must gain or lose something by the change.[36] *Id.* at n. 4 (citing, *inter alia, Boyd v. McCarty,* 142 Tenn. 670, 222 S.W. 528 (1920)); *Estate of Hordeski v. First Fed. Sav. & Loan Ass'n of Russell County, Ala.,* 827 S.W.2d 302 (Tenn.Ct.App.1991), *see also Tampa Elec. Co. v. Nashville Coal Co.,* 214 F.Supp. 647 (M.D.Tenn.1963); 17A Am.Jur.2d *Contracts,* §§ 501, 502.

Mutual consideration for the modification of an existing contract, however, is not always required. *See* JOSEPH M. PERILLO, CALARMARI & PERILLO ON CONTRACTS § 4.9(a) (5th ed.2003) (describing rule requiring consideration for modification of contract as a rule that "can defeat the justifiable expectations of the parties" and noting that "dissatisfaction with the rule has led to a number of exceptions"). One exception to the rule requiring consideration for an agreed modification arises when the parties have an honest dispute as to the interpretation of the existing contract, and they agree to a modification of the contract in settlement of the dispute.[37] *See* 21

---

**36.** "The rule has its origins in the striking down of coerced modifications ... [such as where] one contracting party has been subjected to a holdup game so that the promisor made the new promise under some degree of economic duress." JOSEPH M. PERILLO & HELEN HADJIYANNAKIS BENDER, CORBIN ON CONTRACTS § 7.1, at 342.

**37.** Although this exception arguably would apply in the instant case had the parties been

Tenn. Prac. Contract Law and Practice § 5:21; *see also* 2 Joseph M. Perillo & Helen Hadjiyannakis Bender, Corbin on Contracts § 7.17 (rev. ed.1995 & Supp. 2008); Restatement (Second) of Contracts § 74(1)(a) (1981). Another exception arises in the common situation in which a party to a contract encounters unforeseen difficulties in performing its obligations under the contract. The Restatement addresses this situation as follows:

A promise modifying a duty under a contract not fully performed on either side is binding

(a) if the modification is fair and equitable in view of circumstances not anticipated by the parties when the contract was made.

Restatement (Second) of Contracts § 89(a) (1981).[38] *See also* 17A Am.Jur.2d *Contracts* § 504 (commenting that the rule in this Restatement section is "consistent with good sense and morals and ... affording protection against exactions approaching extortion"); 21 Tenn. Contract Law and Prac., *supra*, § 5:21 (stating that this approach in the Restatement "recognize[s] the business realities in this situation"); *see also* Gregory G. Sarno, *Enforceability of Voluntary Promise of Additional Compensation Because of Unforeseen Difficulties in Performance of Existing Contract*, 85 A.L.R.3d 259 (1978). The Restatement offers the following example of a modification in light of circumstances not anticipated by the parties:

By a written contract A agrees to excavate a cellar for B for a stated price. Solid rock is unexpectedly encountered and A so notifies B. A and B then orally agree that A will remove the rock at a unit price which is reasonable but nine times that used in computing the original price, and A completes the job. B is bound to pay the increased amount.

Restatement (Second) of Contracts § 89 cmt. b, illustr. 1 (1981).[39]

Thus, under § 89, a modification of an existing contract need not be supported by new consideration so long as it is agreed upon by the parties in light of unforeseen difficulties, and the modification is fair and equitable under the circumstances.[40]

We consider this principle as applied to the modifications made to the contractual arrangement between Old Shoney's and ShoLodge in September 2000. In 2000, the once-successful Shoney's restaurant

embroiled in a legal dispute, New Shoney's correctly notes that the record is devoid of any evidence that ShoLodge had threatened Old Shoney's with litigation over the closing of the Shoney's restaurants.

**38.** Corbin on Contracts describes this Restatement section as "synthesiz[ing] the cases that have overturned the pre-existing duty rule as well as cases employing various techniques by which the rule was honored but circumvented." Perillo & Bender, *supra* note 36, § 7.6, at 357. It described the cases utilizing these "techniques" as including:

[Cases] asserti[ng] that a contracting party has the alternative right to breach and answer in damages, finding a rescission of the prior contract ..., cases seizing upon a slight change in the performance as consid-

eration, and cases that have squarely held that a promise to compensate for increased difficulty, expense or hardship is binding. *Id.* (footnotes omitted).

**39.** This is a contrast to the situation in which the parties enter into the agreement with the understanding that one party will assume the risk of a change in circumstances; in such a case, the change would not be "unanticipated."

**40.** We note that Tennessee's legislature has adopted a version of this approach with respect to contracts for the sale of goods under the Uniform Commercial Code. *See* Tenn. Code Ann. § 47–2–209(1) (2001) (providing that, under the U.C.C., an agreement modifying a contract for the sale of goods needs no consideration to be binding).

chain had declined precipitously, and many of the restaurants that had closed were located adjacent to a Shoney's Inn. This removed the underpinning of the symbiotic relationship established between the parties in the 1991 Original License Agreement, and it hindered the ability of the Shoney's Inns motels to attract travelers in the competitive lodging industry. In addition, it rendered obsolete the provisions in the 1991 Original License Agreement that required ShoLodge to promote the adjacent Shoney's restaurant to its patrons and refrain from providing its guests with a non-Shoney's food service.[41]

■ Under these undisputed facts, it is clear that the closure of more than half of the units in the Shoney's restaurant chain constituted "circumstances not anticipated by the parties" when they entered into their original agreement.[42] *Id.* at § 89(a). The problem this created for ShoLodge was stated expressly to Old Shoney's by ShoLodge executives. Recognizing that the closure of so many Shoney's restaurants materially altered the foundation of the parties' original agreement, ShoLodge proposed to Old Shoney's that the parties modify the licensing agreement to permit the operation of an in-motel restaurant "[i]n the cases where there is no adjoining Shoney's restaurant." Old Shoney's recognized the difficulties posed by this situation, and readily agreed to modify the existing contractual arrangement. Thus, the modification addressed the difficulties for ShoLodge in performing its contractual duties due to the unanticipated restaurant

closures in a manner that was clearly "fair and equitable" under the circumstances. *Id.* In such a situation, where the modification of the contract was based on the parties' inability to fully perform under the contract as written, new consideration would not be necessary to support the modification, and the new contract would be binding on the parties. *Id.*

Nevertheless, we think that it is more accurate in this case to recognize that the ongoing contractual relationship and the continued exchange of mutual benefits was of value to both ShoLodge and Old Shoney's, and that this constitutes consideration to support the modifications embodied in the Amended and Restated License Agreement. The 1991 Original License Agreement not only granted a license to use the Shoney's Inn service marks, it also set up a mutually beneficial arrangement between the Shoney's restaurant chain and the Shoney's Inn motel chain. The original agreement provided that sites for the Shoney's Inn motels had to be approved by licensor Old Shoney's, and the motels were expected to rely on the nearby Shoney's restaurants for food service for their guests. The motels were thus relieved of the expense of operating an in-motel restaurant, and they could depend on the popular Shoney's restaurants to serve their guests' needs. In turn, the restaurants benefitted from patronage by motel guests, and by cross-marketing required in the license agreements.[43] While the licensing agreements were incrementally

---

41. The closure of the Shoney's restaurants made some of the Shoney's Inn obligations impossible to perform, such as placing the menu of the adjacent Shoney's restaurant in each motel room.

42. The record shows that, in 1994, there were 922 Shoney's restaurants in operation. By October 2000, there were only 459 Shoney's restaurants.

43. For example, the Shoney's Inn motels were required to keep a menu for the adjacent Shoney's restaurant in each guest room, and were prohibited from putting promotional material for other restaurants in guests' rooms.

amended over time to permit limited food service in the motels,[44] Shoney's Inns were not permitted to have a full-service restaurant without the prior written consent of Old Shoney's.

In 2000, it became necessary for the parties to amend their arrangement based on the precipitous closings of the Shoney's restaurants. The Amended and Restated License Agreement amended the parties' contractual arrangement for the mutual benefit of both ShoLodge and Old Shoney's. The new agreement obviously benefitted ShoLodge by allowing it to establish non-Shoney's restaurants in certain Shoney's Inn motels. The agreement also benefitted Old Shoney's. As GuestHouse correctly noted, the Old Shoney's was no longer bound by the "no-infringement" that was included in the first agreement, relieving Old Shoney's of the responsibility under this warranty.[45] More importantly, executing the new agreement to accommodate ShoLodge's needs preserved the parties' mutually beneficial contractual relationship. *See Book–Mart of Florida, Inc. v. Nat'l Book Warehouse*, 917 S.W.2d 691, 694 (Tenn.Ct.App.1995) (finding that "entering into a relationship which can inure to the benefit of both parties" constitutes consideration for a contract); *see also Morvai v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, No. 02–P–860, 2002 WL 31898116, at *2 (Mass.Ct.App.2002); *Tur-*

*ner–Bass Assocs. of Tyler v. Williamson*, 932 S.W.2d 219, 222–23 (Tex.App.—Tyler 1996). To an extent, agreeing to the accommodation was an attempt by Old Shoney's to avert what eventually occurred— ShoLodge's decision to disassociate itself from the affiliation with the Shoney's brand name. Furthermore, the Amended and Restated License Agreement imposed mutual obligations on the parties. For example, ShoLodge is permitted to operate non-Shoney's restaurants in some motels, but those motels must post the disclaimer plaques therein.[46]

As we have stated, to determine whether the Amended and Restated License Agreement is supported by consideration, we review the agreement in its entirety, "not as separate, unrelated sets of promises." *Anesthesia Med. Group*, 2007 WL 412323, at *6. In doing so, we conclude that the new agreement was supported by reciprocal consideration that was both express and implicit in the circumstances, in the form of mutual benefits and obligations resulting to both ShoLodge and Old Shoney's from the agreement, and also in the continuation of the mutually beneficial relationship that had existed between the parties for nine years prior to the amended agreement and continued for six years thereafter. Consequently, we conclude that the trial court erred in determining

---

44. The Shoney's Inn motels were later permitted to offer hot or cold "continental breakfast foods" such as bread, cereal and pancakes, so long as eggs and meat products were not served.

45. New Shoney's argues that the deletion of the "no-infringement" section did not constitute a benefit to Old Shoney's because Section 2.1 made the same substantive representation. We disagree. The 1991 Original License Agreement included both Sections 2.1 (the "ownership" clause) and 2.2 (the "no infringement" clause), but the new agreement included only the original Section 2.1 virtual-

ly verbatim. These clauses do not serve the same purposes.

46. We reject the contention of New Shoney's that this requirement does not constitute consideration because ShoLodge was already obliged under trademark laws to take measures to avoid confusion with the Shoney's trademarked service mark. Such confusion can be avoided in many ways, and the provision required ShoLodge to take a specific measure to avoid confusion that was acceptable to Old Shoney's.

that the Amended and Restated License Agreement failed for lack of consideration.

### 2. Fraud/Failure to Disclose

■ New Shoney's also terminated the Amended and Restated License Agreement based on Section 7.1(g), which states that New Shoney's can terminate the agreement if GuestHouse shall "commit any acts of fraud or intentional misrepresentation with respect to the activities relating to any of the Licensed Marks." In the termination letter, New Shoney's asserted that GuestHouse's failure to disclose its intent to relaunch the Shoney's Inn motel chain "amounts to fraud and misrepresentation and entitles [New] Shoney's to terminate" pursuant to this provision of the Amended and Restated License Agreement. New Shoney's indicated that Old Shoney's relied upon the impression it was given by the actions of ShoLodge and the nondisclosure of GuestHouse in executing the Consent and Estoppel Agreement, in which it gave written consent to the assignment of the license agreement to GuestHouse. In the termination letter, New Shoney's stated specifically:

> [Old] Shoney's would not have approved the assignment of the License Agreement to GuestHouse in December 2006, if GuestHouse had disclosed its intent to begin franchising new SHONEY'S INN motels. In fact, ... GuestHouse's failure to disclose this material fact in connection with seeking Shoney's consent to the assignment to GuestHouse amounts to fraud and misrepresentation that entitles Shoney's to terminate the License Agreement under Section 7.1(g).

In its complaint, GuestHouse claimed that New Shoney's breached the parties' agreement by wrongfully terminating the agreement on this basis. GuestHouse claimed that there was no evidence that it had committed any fraud, and its failure to disclose its intention to relaunch the Shoney's Inn motel chain was not fraudulent because it did not have a duty to disclose to Old Shoney's its intention in this regard when it sought Old Shoney's consent to the assignment of the license agreement.

The trial court below did not make an express finding that GuestHouse engaged in fraud or misrepresentation. It stated, however, that, at the time GuestHouse purchased the Shoney's Inn license and the remaining Shoney's Inn motels from ShoLodge, GuestHouse should have informed Old Shoney's that it intended to franchise new Shoney's Inn motels, and that "[t]his information would have been important to [Old Shoney's] in connection with deciding whether to consent to the requested assignment." The trial court opined:

> If GuestHouse had indicated to [Old Shoney's] that it intended to begin opening or franchising new Shoney's Inn franchise motels, that information would have differed significantly from [Old Shoney's] understanding and expectations regarding the direction of the Shoney's Inn franchise. . . . This information would have been important to [Old Shoney's] in connection with deciding whether to consent to the requested assignment and whether to impose terms or conditions on any such assignment; and would have led Mr. Habermann to request more information and to inform [New Shoney's] management and [New Shoney's] affiliate Royal Capital (which had just entered into a November 26, 2006 letter of intent to acquire the Shoney's assets) before making a decision on whether to consent to the assignment.

Thus, the trial court indicated that, had GuestHouse informed Old Shoney's of its intention to open new Shoney's Inn motel franchises, then Old Shoney's might have

either refused to consent to the assignment of the Shoney's Inn license or placed conditions on the consent that it gave to ShoLodge. Thus, the trial court appeared to hold that Old Shoney's relied to its detriment on its understanding that GuestHouse, like ShoLodge, did not intend to franchise new Shoney's Inn motels, and that this understanding was caused by ShoLodge's misrepresentations and GuestHouse's failure to disclose its true intent.

On appeal, GuestHouse asserts that these findings were erroneous because GuestHouse had no duty to disclose its intent to relaunch the Shoney's Inn motels as a matter of law. GuestHouse maintains that this is not a situation in which there was a previous fiduciary relationship between the parties, the parties had a trust relationship, or the contract was intrinsically fiduciary. *See Macon County Livestock Mkt., Inc. v. Kentucky State Bank,* 724 S.W.2d 343, 349 (Tenn.Ct.App.1986). Therefore, in the absence of a duty to disclose, GuestHouse argues, New Shoney's cannot establish that fraud or misrepresentation justified the termination of the Amended and Restated License Agreement, and the trial court's findings to the contrary must be reversed.

In response, New Shoney's argues that GuestHouse had a legal duty to disclose its intention to relaunch the Shoney's Inn motel chain because (1) the parties had a business or contractual relationship; (2) GuestHouse was aware that ShoLodge had made repeated representations that it would not seek to franchise new Shoney's Inn motels; (3) GuestHouse knew that its intent was contrary to what ShoLodge had expressed; (4) the information was material to the consent given by Old Shoney's in the Consent and Estoppel Agreement; and (5) Old Shoney's relied to its detriment on its understanding that there would be no new attempts to franchise

Shoney's Inn motels. New Shoney's further argues that, not only did GuestHouse fail to disclose a material fact, but Old Shoney's belief that GuestHouse did not intend to franchise new Shoney's Inn motels was reinforced by the misleading statement in the November 15, 2006 email from ShoLodge to the Old Shoney's general counsel. Therefore, New Shoney's argues, the trial court was correct in finding implicitly that the new license agreement was properly terminated based on fraud and misrepresentation.

 Under tort law, the failure to disclose material facts may be deemed equivalent to fraud or misrepresentation "only in the cases where the person being held responsible had a duty to disclose the facts at issue." *Id.* Determining the existence and extent of one person's duty to another is a question of law to be decided by the courts. *Staples v. CBL & Assocs., Inc.,* 15 S.W.3d 83, 89 (Tenn.2000); *Green v. Sacks,* 56 S.W.3d 513, 519 (Tenn.Ct.App. 2001).

 Generally, a duty to disclose information arises in three situations: (1) where there is a previous definite fiduciary relation between the parties, (2) where it appears one or each of the parties to the contract expressly reposes a trust and confidence in the other, and (3) where the contract or transaction is intrinsically fiduciary and calls for perfect good faith. *Macon County,* 724 S.W.2d at 349 (quoting *Domestic Sewing Mach. Co. v. Jackson,* 83 Tenn. 418, 424–25 (1885)). Thus, "silence may constitute fraud when a duty to disclose exists." 37 Am.Jur.2d *Fraud & Deceit* § 204 (2009); *see also Goodall v. Akers,* No. M2008–01608–COA–R3–CV, 2009 WL 528784, at *8 (Tenn.Ct.App. Mar.3, 2009); *Saltire Indus., Inc. v. Waller, Lansden, Dortch & Davis, PLLC,* 491 F.3d 522, 528 (6th Cir.2007) (applying Tennessee law).

On occasion, even in the absence of a fiduciary relationship, Tennessee courts have recognized that "one may be guilty of fraud by his silence, as where it is expressly incumbent upon him to speak concerning material matters that are entirely within his own knowledge." *Simmons v. Evans*, 185 Tenn. 282, 206 S.W.2d 295, 296 (1947). The Tennessee Supreme Court in *Simmons* stated that "each party to a contract is bound to disclose to the other all he may know respecting the subject matter materially affecting a correct view of it, unless common observation would have furnished the information." *Id.* (quoting *Perkins v. McGavock*, 3 Tenn. 415, 417 (1813)). *Simmons* involved the sale of a residential dwelling. The Court found that the seller had a duty to disclose the fact that the home had no water supplied to it beginning each evening at 7 p.m. until 7 a.m. the next morning. Describing this fact as "entirely contrary to ordinary experience," the court concluded that the seller's "failure to disclose was fraud in fact ... [and] amounted to a misrepresentation of a material fact." *Id.* at 297.

The principle in *Simmons* is set forth in RESTATEMENT (SECOND) OF TORTS § 551, cited by New Shoney's in support of its argument. This RESTATEMENT section states:

(1) One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, *if, but only if, he is under a duty to the other* to exercise reasonable care to disclose the matter in question.

(2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,

* * *

(e) *facts basic to the transaction,* if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them ... or other objective circumstances, would reasonably expect a disclosure of these facts.

RESTATEMENT (SECOND) OF TORTS § 551(1) and (2)(e) (1977) (emphasis added).[47] The comments to section 551 explain the phrase "facts basic to the transaction" as follows:

A basic fact is a fact that is assumed by the parties as a basis for the transaction itself. It is a fact that goes to the basis, or essence, of the transaction, and is an important part of the substance of what is bargained for or dealt with. Other facts may serve as important and persuasive inducements to enter into the transaction, but not go to its essence. These facts may be material, but they are not basic.

*Id.* at cmt. j.[48]

We now must apply these standards to the facts in this case. It is undisputed that neither GuestHouse nor ShoLodge

---

47. It is unclear whether this RESTATEMENT section addresses a failure to disclose that is the equivalent of fraud; the reference to "reasonable care" suggests negligence.

48. This comment includes the following illustrations:
3. A sells to B a dwelling house, without disclosing to B the fact that the house is riddled with termites. This is a fact basic to the transaction. 4. A sells to B a dwelling house, knowing that B is acting in the mistaken belief that a highway is planned that will pass near the land and enhance its value. A does not disclose to B the fact that no highway is actually planned. This is not a fact basic to the transaction. RESTATEMENT (SECOND) OF TORTS § 551 cmt. j, illustr. 3 and 4 (1977).

was in a fiduciary relationship with Old Shoney's. All of the entities involved were sophisticated businesses with access to capable attorneys. Moreover, the transactions at issue were not intrinsically fiduciary or calling for perfect good faith, such as in an insurance contract. Thus, the facts do not fit within any of the three situations enumerated in *Macon County*. *See Macon County*, 724 S.W.2d at 349.

Was this, nevertheless, a circumstance in which "it was incumbent upon [GuestHouse] to speak?" *Simmons*, 206 S.W.2d at 296. We look first at whether GuestHouse's intent to relaunch the Shoney's Inn motels was a "fact basic to the transaction." RESTATEMENT (SECOND) OF TORTS § 551(2)(e). To do so, we must first identify the "transaction."

The transaction at issue here is the consent by Old Shoney's to ShoLodge's assignment of the license agreement to GuestHouse, which was formalized in the Consent and Estoppel Agreement. The requirement for ShoLodge to obtain the consent of Old Shoney's to the assignment arose from Section 4.8(a) of the Amended and Restated License Agreement, providing that the "Licensee shall not ... sell, assign, transfer [or] convey its rights ... hereunder [without] Licensor's consent. . . ." That provision further provides that such consent will not be unreasonably withheld so long as the assignment is made "to a person or entity who has experience in the operation of motels and who is, in the sole judgment of Licensor, of good character and reputation and capable, financially and otherwise, of performing the duties and obligations of Licensee hereunder." The Amended and Restated License Agreement states further that the consent of Old Shoney's would be "subject to the assignee's agreement in writing to assume and perform all of the transferor's duties and obligations hereunder."

New Shoney's argues strenuously that GuestHouse's intent to relaunch the Shoney's Inn motel chain was required to be disclosed. It relies on the testimony of Old Shoney's executive Ted Habermann, who executed the Consent and Estoppel Agreement, in which he asserts that GuestHouse's expressed intention to relaunch the Shoney's Inn motels differed from his "understanding" and "expectation" that there "would be no franchising of new Shoney's Inn motels." Mr. Habermann stated that the information about GuestHouse's intent at the time of the assignment would have been "important in connection with deciding whether to consent to the requested assignment, and whether to impose terms or conditions on any such assignment."

However, the Amended and Restated License Agreement describes precisely the type of facts that were "basic" to the consent of Old Shoney's to the assignment to GuestHouse. Such basic facts included, for example, whether GuestHouse had "experience in the operation of motels" or was "capable, financially and otherwise of performing the duties" under the agreement, or whether it would agree in writing to assume ShoLodge's obligations under the agreement. The extent to which GuestHouse intended to use the license, and specifically whether it planned new franchising, is at most tangential to the transaction at issue, namely, the contractually required consent of Old Shoney's to the assignment. *See* RESTATEMENT (SECOND) OF TORTS § 551 cmt. j, illustr. 4. Under the plain terms of the Amended and Restated License Agreement, Old Shoney's was not authorized to withhold consent or place conditions on its consent simply because the assignee intended to actually use its licensure rights under the agreement.

Furthermore, the facts do not support a conclusion that GuestHouse would have

known that Old Shoney's was "about to enter into [the Consent and Estoppel Agreement] under a mistake" as to Guest-House's intent to franchise new Shoney's Inn motels. New Shoney's recites the plethora of facts showing that *ShoLodge* had no intent to franchise new Shoney's Inn motels, and insists that GuestHouse had to know that Old Shoney's would naturally assume that GuestHouse, likewise, had no intent to franchise new motels. This is fallacious, a leap of logic that we are unwilling to make. New Shoney's had no basis for its assumption about Guest-House's intent regarding the Shoney's Inn license. That GuestHouse would plan to put to use the license it acquired is not a circumstance that is "entirely contrary to ordinary experience," regardless of how little *ShoLodge* had valued the Shoney's Inn license. *Simmons,* 206 S.W.2d at 297.

Moreover, under the facts as they existed at the time Old Shoney's executed the Consent and Estoppel Agreement, Guest-House's intent to use the Shoney's Inn license is not a fact that GuestHouse would know might "justifiably induce [Old Shoney's] to act or refrain from acting." RE-STATEMENT (SECOND) OF TORTS § 551(1). During the years leading up to the execution of the Consent and Estoppel Agreement, the record shows that ShoLodge and Old Shoney's had a cooperative relationship. The record indicates that both valued the mutual benefit derived from the ongoing relationship between the Shoney's restaurant chain and the Shoney's Inn motel chain, and each agreed to amendments to the license agreement to facilitate its continuation. No evidence indicates that

ShoLodge's decision to discontinue franchising Shoney's Inn motels was made at the insistence of Old Shoney's, or even that Old Shoney's wanted such a discontinuation. There is simply nothing that the parties have brought to the attention of the Court that would have caused Guest-House to know that its intent to franchise new Shoney's Inn motels "may justifiably induce" Old Shoney's to refrain from consenting to the assignment of the license.[49] *Id.*

Thus, we must conclude that Guest-House had no duty to disclose, to either ShoLodge or Old Shoney's, its intent to relaunch the Shoney's Inn motel chain. Therefore, its failure to do so did not constitute fraud or intentional misrepresentation under Section 7.1(g) of the Amended and Restated License Agreement, and termination of the agreement by New Shoney's on this basis was invalid and constituted a breach of the agreement.

In addition, in light of our finding that GuestHouse did not have a duty to disclose its intention, along with the fact that GuestHouse did not make any affirmative misrepresentations to Old Shoney's, we reject the argument of New Shoney's that GuestHouse is equitably estopped from franchising additional Shoney's Inn motels. *See Lusk v. Consol. Aluminum Corp.,* 655 S.W.2d 917, 920 (Tenn.1983).

### 3. Approval for the Sale of GuestHouse from ShoLodge to Settle Inn

The third reason given by New Shoney's for its termination of the Amended and Restated License Agreement was

49. At the time the Consent and Estoppel Agreement was executed, Old Shoney's and New Shoney's had executed a letter of intent for New Shoney's to purchase the assets of the restaurant chain, including the ownership of the Shoney's Inn service mark. However, the parties have pointed to nothing indicating GuestHouse was aware of this impending transaction. Even if GuestHouse had been aware, there is nothing indicating that Guest-House would have known that New Shoney's would have been opposed to GuestHouse relaunching the Shoney's Inn motels.

based on its finding that "the failure of GuestHouse, ShoLodge, or Settle Inn to seek or obtain Shoney's approval to Sho-Lodge's sale of GuestHouse to Settle Inn amounts to a separate breach of the License Agreement." In its counterclaim against GuestHouse, New Shoney's substantially revised this ground for termination, claiming the termination was actually based on "GuestHouse's failure to seek or obtain [Old Shoney's] prior written consent to the underlying transfer of GuestHouse Inn assets and Shoney's Inn assets from ShoLodge F.S. and ShoLodge, Inc. to GuestHouse, as required by Sections 4.8 and 6.5 of the 2000 License Agreement."

GuestHouse argues that this claimed basis for termination must be deemed improper because the reason stated in the letter of termination was factually incorrect, as ShoLodge never owned Guest-House International LLC and, thus, never sold it to Settle Inn. This attempt by New Shoney's to revise the basis for termination in its counterclaim should be rejected, GuestHouse argues, because it is, in effect, a new ground for termination on which it did not rely in the termination letter. Even if a "revised" basis for termination claimed by New Shoney's were considered, GuestHouse argues, it too must fail. GuestHouse argues that Section 6.5 of the Amended and Restated License Agreement merely states that ShoLodge will not sell or transfer its assets "unless such transaction may occur without violating the provisions of *Section 4.8* hereof." The relevant paragraph of Section 4.8 provides that ShoLodge shall

not assign or sell its rights under the agreement "without the prior express written consent of the Licensor." [50] Because GuestHouse obtained the consent of Old Shoney's pursuant to the Consent and Estoppel Agreement, no contractual provision was violated.

In response, New Shoney's claims that Section 6.5 addresses a sale of the licensee's assets and appears to require the same prior written consent of the licensor as is required by Section 4.8 in relation to a stock sale. New Shoney's argues that, "[a]t a minimum, if the Court were to conclude that Section 6.5 is ambiguous as to whether the Licensee needed to obtain the consent of the Licensor to an underlying asset sale, then there is a question of fact as to the parties' intent and parole evidence would be admissible to determine that intent."

While the revised position by New Shoney's in its counterclaim is interesting, it is simply not the basis on which New Shoney's terminated the Amended and Restated License Agreement in the August 17, 2007 termination letter. As pointed out by GuestHouse, "[w]here a party gives a reason for his conduct and decision touching anything involved in the controversy, he cannot, after litigation has begun, change his ground, and put his conduct upon another and different consideration." *Louisville & N.R. Co. v. Klyman*, 108 Tenn. 304, 67 S.W. 472, 475 (1902). Therefore, we analyze the ground for termination as stated by New Shoney's in its termination letter.

50. Section 4.8 also provides:

In the event the Licensee is a corporation, limited partnership, business trust, partnership or similar association, the shareholders, limited partners, beneficiaries, partners or investors, as the case may be, may not sell, assign or otherwise transfer their shares or interests in such corporation, limited partnership, business trust, partnership or similar association, without the prior written consent of Licensor.

GuestHouse contends that "[t]his provision is irrelevant because ShoLodge, Inc. sold its interest in the Licensee."

In the letter, New Shoney's asserted that "the failure of GuestHouse, Sho-Lodge, or Settle Inn to seek or obtain Shoney's approval to ShoLodge's sale of GuestHouse to Settle Inn amounts to a separate breach of the License Agreement." This was based on the fact that New Shoney's had "recently learned that on December 2, 2006, ShoLodge, Inc. sold GuestHouse to Settle Inn LLC ("Settle Inn")." "GuestHouse" is defined in the letter to refer to GuestHouse International, L.L.C. As GuestHouse correctly points out, however, ShoLodge never owned GuestHouse International LLC and, therefore, never "sold GuestHouse to Settle Inn LLC." [51] Therefore, because this stated reason for termination is factually erroneous, and because New Shoney's cannot now revise its basis for termination, we must conclude that this ground for termination fails as a matter of law.

Thus, we hold that the three bases on which New Shoney's rescinded and terminated the Amended and Restated License Agreement, namely, lack of consideration, fraud/misrepresentation, and the failure to obtain written consent for the sale of GuestHouse to Settle Inn, were all invalid. Thus, the rescission and termination of the Amended and Restated License Agreement by New Shoney's constituted a breach of that agreement.

### Waiver

■ The trial court held in the alternative that, even if the Amended and Re-stated License Agreement were otherwise valid, ShoLodge waived the right to franchise additional Shoney's Inn motels because it "made the conscious and informed decisions to phase out and close out the Shoney's Inn brand and that there would be no franchising of Shoney's Inn motels in the future." [52] Thus, if ShoLodge had waived its right under the Amended and Restated License Agreement to franchise new Shoney's Inn motels, it could not assign this right to GuestHouse in the 2006 transfer of assets. As noted above, the trial court relied on facts in the record showing that, in 2002, ShoLodge made a conscious decision to stop franchising Shoney's Inn motels and convert all of its motels to the GuestHouse brand, made numerous public statements to that effect, and in fact converted nearly all of its motels to the GuestHouse brand, leaving only a few Shoney's Inn motels in existence at the time of the 2006 transaction with GuestHouse.

On appeal, GuestHouse argues first that the trial court erred because the 2006 Consent and Estoppel Agreement, in which Old Shoney's reaffirmed that the Amended and Restated License Agreement was valid and binding, precludes as a matter of law any claim that ShoLodge waived its right to franchise new motels under the Amended and Restated License Agreement. Alternatively, GuestHouse asserts, the trial court's analysis on this issue ig-

---

**51.** The origin of the confusion may have arisen from the fact that the GuestHouse Inn & Suites hotels were owned by ShoLodge, not GuestHouse International, L.L.C. ShoLodge sold these assets, along with the remaining Shoney's Inn motels, to Settle Inn and its assignee, GuestHouse International L.L.C. Thus, in effect, ShoLodge sold the chain of GuestHouse Inn & Suites hotels to Guest-House International, L.L.C. The claimed basis for termination is further confused by the fact that the letter refers to "Shoney's,"
which, as that term is defined in the letter, would include both Old Shoney's and New Shoney's. Therefore, it is unclear to whom any required notice was due.

**52.** The "waiver" argument by New Shoney's apparently was only as to ShoLodge's or GuestHouse's franchising of new Shoney's Inn motels and did not apply to their use of the Shoney's Inn service marks for the few existing Shoney's Inn motels.

nores evidence showing that ShoLodge reserved the right to offer Shoney's Inn franchises in the future if it chose to do so. GuestHouse claims that the conflicting evidence presented to the trial court at least creates a fact question on the issue of waiver, and that summary judgment on this issue was not proper. Accordingly, GuestHouse argues that the trial court's decision to grant the New Shoney's motion for summary judgment on this basis must be reversed.

In response, New Shoney's maintains that the finding of waiver was correct, relying in large part on the reasoning utilized by the trial court. It argues that the few statements made by ShoLodge executives that the company "may in the future" choose to franchise new Shoney's Inn motels shows only ShoLodge's subjective intent, which is irrelevant because waiver is determined objectively based on a party's acts and declaration of intent. It also contends that a finding of waiver is not precluded by any statements in the 2006 Consent and Estoppel Agreement.

In its memorandum opinion, the trial court utilized an often recited definition of "waiver" as "[a] voluntary relinquishment by a party of a known right." *Chattem, Inc. v. Provident Life & Accident Ins. Co.*, 676 S.W.2d 953, 955 (Tenn.1984) (citing *Baird v. Fidelity–Phenix Fire Ins. Co.*, 178 Tenn. 653, 162 S.W.2d 384, 389 (1942)). This definition, however, has been criticized as oversimplified and apt to lead to misconceptions:[53]

> A waiver ... is generally defined as a voluntary and intentional relinquishment of a known right.... [T]here are few, if

any, more erroneous definitions known to the law. For one thing, waiver is far more multifaceted than this definition would allow for. Moreover, even as far as it goes, it is totally misleading. It strongly implies that the waiving party intends to give up a right. In reality, many, if not most waivers are unintentional and frequently do not involve a "right" that the party is aware of. Finally, contractual *rights* are not waivable, *conditions* are.

PERILLO, *supra*, § 11:29(c) (footnotes omitted).[54] In general, the doctrine of waiver is "an excuse for nonperformance of contractual duties or conditions ... based in large part on the policies against forfeiture and unjust enrichment." 13 RICHARD A. LORD, WILLISTON ON CONTRACTS § 39:15 (4th ed.2009) (footnotes omitted). It is "designed to prevent the waiving party from lulling another into a belief that strict compliance with a contractual duty will not be required, and then either suing for noncompliance or demanding compliance for the purpose of avoiding the transaction." *Id.* For this reason, the doctrine of waiver "applies primarily to conditions which may be thought of as procedural or technical, or to instances in which the non-occurrence of a condition is comparatively minor." RESTATEMENT (SECOND) OF CONTRACTS § 84 cmt. d (1981) (citing as examples conditions that relate merely to the time or manner of the return performance or provide for the giving of notice).

Thus, the definition of waiver as "a voluntary relinquishment by a party of a known right," applies to a waiver of the right to enforce a provision in a contract,

---

**53.** *See* RESTATEMENT (SECOND) OF CONTRACTS § 84 cmt. b (1981) (referring to this definition of waiver as "inexacting").

**54.** Waiver "is a troublesome term in the law.... It is used with different meanings and there are, therefore, necessarily conflict-

ing judicial statements as to its requisites." *Billman v. V.I. Equities Corp.*, 743 F.2d 1021, 1024 (3d Cir.1984) (quoting 5 WILLISTON ON CONTRACTS § 678 at 239 (ed. W.H.E. Jaeger 1961)).

not to the waiver of a right acquired under the contract in the agreed exchange. *See* PERILLO, *supra*, § 11.29(c); *see also Baird v. Fidelity–Phenix Fire Ins. Co.*, 178 Tenn. 653, 162 S.W.2d 384, 389 (1942); *Chattem*, 676 S.W.2d at 955; *Tennessee Asphalt Co. v. Purcell Enters., Inc.*, 631 S.W.2d 439, 444 (Tenn.Ct.App.1982). Indeed, "a waiver of a material part of the agreed exchange is ineffective. Only an immaterial part of the agreed exchange may be waived." PERILLO, *supra*, § 11:31.[55]

Moreover, waiver is defensive in nature, in that it is ordinarily raised as a defense to a claim based on breach of contract. "Waiver is not a cause of action because it cannot create liability in and of itself, and waiver cannot be asserted in a complaint as an offensive weapon."[56] 28 Am.Jur.2d *Estoppel & Waiver* § 167 (2000); *see Madden Phillips Constr. Inc. v. GGAT Dev't Co.*, No. W2008–02350–COA–R3–CV, 2009 WL 3064898, at *9 (Tenn.Ct.App. Sept.25, 2009) (recognizing that waiver is an affirmative defense under Tennessee Rule of Civil Procedure 8.03; discussing Tennessee cases on the point).

■■■■■ Waiver "may be proved by express declaration; or by acts and declarations manifesting an intent and purpose not to claim the supposed advantage; or by a course of acts and conduct." *Chattem*, 676 S.W.2d at 955. Stated another way, "waiver is proven by a clear, unequivocal and decisive act of the party, showing a purpose to forgo the right or benefit which is waived." *E & A Ne. Ltd. P'ship*, 2007 WL 858779, at *7. "The law will not presume a waiver, and the party claiming the waiver has the burden of proving it by a preponderance of the evidence." *Jenkins Subway, Inc. v. Jones*, 990 S.W.2d 713, 722 (Tenn.Ct.App.1998). Generally, whether a waiver of a contractual provision has occurred in a given factual setting is a question of fact for trial. *Gaston v. Tenn. Farmers Mut. Ins. Co.*, 120 S.W.3d 815, 819 (Tenn.2003).

The cases on which New Shoney's relies are illustrative. In *Chattem*, an employee of the plaintiff business filed a claim for disability benefits with the defendant insurance company. The insurance company denied the claim because a proof of disability was not filed within one year of the employee's termination of employment, and the timely furnishing of proof of disability was required by the policy as a condition precedent to recovery. *Chattem*, 676 S.W.2d at 955. The Supreme Court

---

**55.** On this point, the RESTATEMENT gives the following example:

> A promise is often conditional on the receipt of some performance regarded as the equivalent of the performance promised, as in the case of an option contract to sell a horse if the promisee pays $500 for him. A promise may also be conditional on a fortuitous event, and the risk or burden assumed by the promisor may depend on the probability that the condition will occur, as in a promise to disregard the non-occurrence of the condition materially affects the value received by the promisor or the burden or risk assumed by him, the promise is not binding.... Such a promise may be binding by virtue of reliance or for some other reason.... But a waiver of the price

of a horse or of the fire required by an insurance policy is not within this Section. RESTATEMENT (SECOND) CONTRACTS § 84 cmt. c (1981).

**56.** In addition, in Tennessee, to establish waiver, "there must be consideration or a substitute, such as reliance, which will give rise to an estoppel." 13 WILLISTON ON CONTRACTS-FORMS § 39F:9 (4th ed.) (indicating Tennessee is in minority on this point); *see Moore v. Union Stock Yards, Inc.*, 169 Tenn. 638, 90 S.W.2d 524, 527 (1936); *Bokor v. Holder*, 722 S.W.2d 676, 680 (Tenn.Ct.App. 1986); *Patton v. Bearden*, 8 F.3d 343, 346 (6th Cir.1993) ("Tennessee law requires either consideration or an element of estoppel for a contractual waiver.").

held that the insurance company had waived the right to demand strict enforcement of the timeliness requirement, because it had waived that condition precedent in seven out of eleven claims filed by the plaintiff in the past. The Court held that "[t]he defendant's waiver of the time requirements in the original insurance policy has the same effect as if the requirement was not a condition precedent to recovery." *Id.* at 956.

In *Baird,* cited in *Chattem,* the plaintiff executor sought to recover proceeds under a homeowners/fire insurance policy for fire damage to his decedent's store. The insurance policy had been renewed in the executor's name after the decedent had died but before her estate had been closed. When the executor filed a claim for insurance proceeds after the fire, the insurance company denied the claim because a provision in the policy required that the insured's interest in the building be "sole and unconditional." *Baird,* 162 S.W.2d at 385. The executor's interest in the store was uncertain because of pending litigation, and because of this the insurance company claimed that the policy provision had been breached. In defense, the executor claimed that the insurance company had waived the "sole and unconditional" ownership requirement by renewing the policy with knowledge of the facts that otherwise would have defeated coverage. The Supreme Court agreed, reasoning that, "[w]here the insurer, at the time of the issuance of a policy of insurance, has knowledge of existing facts which, if insist-

ed upon, would invalidate the contract from its very inception, such knowledge constitutes a waiver of conditions in the contract inconsistent with the known facts, and the insurer is estopped thereafter from asserting the breach of such conditions." [57] *Id.* at 385–86 (quoting *Life & Cas. Ins. Co. v. King,* 137 Tenn. 685, 195 S.W. 585, 589 (1917)).

Thus, in both *Chattem* and *Baird,* the doctrine of waiver is applied to a procedural or technical condition, not to a substantive right. The doctrine is applied defensively as an excuse for nonperformance, in order to avoid forfeiture. In both cases there was an act by the party against whom waiver was asserted, and reliance by the party asserting waiver. Both *Chattem* and *Baird,* then, are consonant with the principles outlined above and, in our view, demonstrate that the doctrine of waiver is simply not applicable to the facts in this case.

First, New Shoney's asserts that Sho-Lodge waived the right to franchise new Shoney's Inn motels. New Shoney's does not assert waiver as to a comparatively minor procedural or technical condition, but rather, as to "a material part of the agreed exchange," indeed, the very object of the license agreements at issue. PERILLO, *supra,* at § 11:31; RESTATEMENT (SECOND) ON CONTRACTS § 84 cmt. d. This contrasts with *Chattem* and *Baird,* in which the doctrine of waiver was applied to a technical or procedural condition.

Second, New Shoney's does not assert waiver defensively, as an excuse for non-

---

57. Waiver is commonly invoked in construction cases because of the nature of the business; owners often waive the written notice requirement for changes in construction in order to keep the project moving. *See M.R. Stokes Co. v. Shular,* No. M2006–02659–COA–R3–CV, 2008 WL 544665, at *4 (Tenn.Ct.App. Feb.26, 2008) (citing *Moore Constr. Co. v. Clarksville Dep't Elec.,* 707 S.W.2d 1, 13

(Tenn.Ct.App.1985)); *see also E & A Ne. Ltd. P'ship,* 2007 WL 858779, at *7 (concluding that landlord did not waive its right to the original rental price through its conduct in accepting rental payments for a lesser amount where there was no indication that the landlord had agreed to the lesser amount by such acceptance).

performance or to avoid forfeiture. Instead, waiver was asserted by New Shoney's offensively. New Shoney's claims that ShoLodge waived its right to franchise new Shoney's Inn motels under the agreement by engaging in conduct that indicated an intent not to use those rights, and that this waiver is binding as to Guest-House. Thus, New Shoney's seeks to use waiver "as an offensive weapon" to establish forfeiture of GuestHouse's contract rights rather than to avoid forfeiture. *See* Am.Jur.2d *Estoppel & Waiver* § 167; 13 WILLISTON ON CONTRACTS, *supra*, § 39:15. Once again, this contrasts with *Chattem* and *Baird*, in which the doctrine of waiver was asserted defensively as an excuse for nonperformance, to avoid forfeiture of contractual rights.

Finally, even if the doctrine of waiver were applicable, waiver has not been established under the facts of this case. New Shoney's argues that ShoLodge, and thus GuestHouse, waived a *portion* of its licensure rights, that is, the right to use the Shoney's Inn service marks to franchise new Shoney's Inn motels. There is no basis in any of the license agreements for finding that the parties intended for the license to be divided into a right to use the service mark for existing motels and a right to use the service mark for new motels. The Amended and Restated License Agreement simply grants a license to use the Shoney's Inn service marks, and ShoLodge either had a right to use the marks or it did not. Thus, the applicability of the doctrine of waiver must be ascertained with respect to ShoLodge's overall use of the Shoney's Inn service marks, without a distinction between its use for existing motels versus its use for new motels. It is undisputed that ShoLodge never discontinued the use of the Shoney's Inn service marks, if only for a few remaining motels. Thus, in all of the various representations made by Sho-Lodge, it is undisputed that it never completely discontinued use of the Shoney's Inn service marks. For this reason, even if the doctrine of waiver were applicable to ShoLodge's right to use the Shoney's Inn service marks, waiver has not been established.

Accordingly, we reverse the trial court's alternative holding that ShoLodge waived its right to franchise new Shoney's Inn motels through its public and private representations and course of conduct and that, therefore, GuestHouse received no such right in the assignment from Sho-Lodge.

### Consumer Protection Act, Tortious Interference Claims

New Shoney's argues in the alternative that even if we reverse the trial court's decision with respect to GuestHouse's claims based on breach of contract, we should nevertheless affirm the trial court's dismissal of GuestHouse's claims that New Shoney's violated the Tennessee Consumer Protection Act and committed tortious interference with GuestHouse's prospective business relationships. New Shoney's maintains that the undisputed evidence shows that the actions by New Shoney's were not "unfair," and that they constituted nothing more than a breach of the license agreement. GuestHouse, however, claims that the evidence is sufficient to establish that New Shoney's knowingly terminated the license agreement without a sufficient legal basis, and that it did so in bad faith. GuestHouse further argues that evidence in the record shows that New Shoney's had full knowledge of GuestHouse's dealings with potential franchisees and with existing Shoney's Inn motels, and that its wrongful termination of the license agreement interfered with these relationships.

The trial court's dismissal of Guest-House's complaint was based primarily on its decision that the Amended and Restated License Agreement was invalid for lack of consideration, and that GuestHouse waived its right to franchise new Shoney's Inn motels. The trial court did not separately address GuestHouse's claims against New Shoney's for violation of the Consumer Protection Act or for tortious interference with prospective business contracts, but those claims were dismissed along with the other counts in the complaint. Specifically, the trial court did not address the alternative arguments of New Shoney's as to why the Consumer Protection Act and tortious interference claims should be dismissed.

Our holding that the Amended and Restated License Agreement was valid and enforceable, and that New Shoney's breached it, removes the basis for the trial court's dismissal of all of GuestHouse's claims, including the dismissal of the Consumer Protection Act and tortious interference claims. Because the trial court did not address the alternative arguments of New Shoney's on these tort claims, we decline to address them at this juncture. This holding does not preclude the trial court from considering on remand the additional arguments by New Shoney's for dismissal of these claims.

### Restitution

■■■ We next consider the trial court's dismissal of GuestHouse's request for restitution as a remedy for the breach of the Amended and Restated License Agreement by New Shoney's. In Count 6 of its amended complaint, GuestHouse claims that, because New Shoney's improperly rescinded and terminated the Amended and Restated License Agreement, it is entitled to treat the agreement as rescinded and recover restitution damages from both

New Shoney's and Old Shoney's. Guest-House asserts that New Shoney's "is obligated to return to GuestHouse the $5.25 million in royalty fees which GuestHouse (or its predecessor) paid to [Old Shoney's] pursuant to the [1991 Original License Agreement]." GuestHouse further avers that, "[a]s the assignor of the [Amended and Restated] License Agreement, [Old Shoney's] is also liable to return to Guest-House the $5.25 million which it paid to [Old Shoney's]."

Later, in a revised and supplemental response to interrogatories, GuestHouse indicates that, as an alternative basis for recovery, it intends to assert that it was entitled to the value of its licensure rights under the Amended and Restated License Agreement at the time New Shoney's improperly terminated the Agreement. It values these licensure rights at $3 million and indicates its intent to offer opinion testimony in support of this valuation.

In granting the New Shoney's motion for summary judgment on GuestHouse's claims for restitution, the trial court held:

"The remedy of restitution restores the injured party to the position he occupied prior to the contract being made." *Chambliss, Bahner and Crawford v. Luther,* 531 S.W.2d 108, 110 (Tenn.Ct.App. 1975). Under the 2000 Agreement the Shoney's Inn marks were used by Sho-Lodge from 2000 to December, 2006 and then by GuestHouse until [New Shoney's] sent a notice of termination dated August 17, 2007. Further, plaintiff sought an injunction and the court allowed the plaintiff to continue to use the Shoney's Marks in connection with the remaining Shoney's Inns. GuestHouse seeks to use the Shoney's Inn Marks and wants return of the lump sum payment for that right.

It is impossible for GuestHouse to make a return of the use of the Shoney's Inn

Marks. The parties cannot be returned to the status quo ante.

Apparently referring to the alternative relief included in GuestHouse's discovery responses, the trial court added, "GuestHouse's second alternative damage request is restitution and not available."

On appeal, GuestHouse notes that, when one party to a contract has committed a material breach, "the non-breaching party has a choice: it can choose to terminate the contract and seek restitution, or it can elect to continue performance and prove its damages," citing *Amber Res. Co. v. United States*, 78 Fed.Cl. 508, 517–18 (Fed.Cl.2007) (citing *Old Stone Corp. v. United States*, 450 F.3d 1360, 1371 (Fed. Cir.2006)). The use of restitution as a remedy, GuestHouse argues, is particularly appropriate where, as here, the damages incurred by the plaintiff are difficult to calculate and prove. *See Glendale Fed. Bank, FSB v. United States*, 239 F.3d 1374, 1380 (Fed.Cir.2001). In addition, GuestHouse claims that Old Shoney's is liable to make restitution as well, as the assignor/original obligor of the Amended and Restated License Agreement. It cites the rule that "[a] party cannot escape its obligations under a contract merely by assigning the contract to a third party. Thus, as a general rule, a party who assigns its contractual rights and duties to a third party remains liable unless expressly or impliedly released by the other party to the contract." *Seagull Energy E & P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 346–47 (Tex.2006) (citations omitted).

In response, New Shoney's and Old Shoney's (collectively "Appellees") argue that, as a matter of law, GuestHouse cannot satisfy the elements necessary to obtain restitution damages. They claim that restitution damages are available in a breach of contract case only when the party injured by the other party's nonperformance or breach tenders back the benefit he received, and here it would be impossible for GuestHouse to tender back what it has received under the contract. Furthermore, the Appellees argue that, even if there is a breach, GuestHouse may not both affirm the contract and seek rescission and restitution; rather, it must elect a remedy. By its claims in the trial court and its continued use of the Shoney's Inn service marks, Appellees argue, GuestHouse has expressed an intention to reaffirm the contract and, therefore, cannot pursue a claim for restitution. Finally, Appellees point out that GuestHouse was not a party to the 1991 Original License Agreement under which the $5.25 million was paid by ShoLodge for the license to use the Shoney's Inn service marks. Because GuestHouse was not a party to the Original Agreement, New Shoney's argues, GuestHouse has no interest in that contract and it is not entitled to restitution for those amounts paid.

Neither party specifically addresses the trial court's dismissal of GuestHouse's "alternative damage" claim. It is, however, considered to be included in the issues raised on appeal, because the trial court dismissed it as falling under the rubric of "restitution."

"Under the general law, remedies available for breach of contract are damages, specific performance, and restitution." *Chambliss, Bahner & Crawford v. Luther*, 531 S.W.2d 108, 110 (Tenn.Ct.App. 1975) (citing CORBIN ON CONTRACTS (1964 ed.), § 1102). Contractual damages are recoverable by a plaintiff who wishes to enforce the contract and obtain the benefit of his bargain. The purpose of this remedy "is to put the party in as good a position as he would have been had the contract been completed, and accordingly a plaintiff may recover for the promised performance as well as consequential damages. CORBIN,

§ 1102." *Id.* Restitution, on the other hand, is the measure of damages recoverable when rescission of the contract is sought and awarded. Restitution "restores the injured party to the position he occupied prior to the contract being made. In some cases, it contemplates the return of the specific property and in others, a judgment for the equivalent in money for the performance rendered by the Plaintiff and received by the Defendant." *Id.* This remedy for breach is traditionally called "rescission and restitution." 26 RICHARD A. LORD, WILLISTON ON CONTRACTS § 68:2 (4th ed.2009). Restitution may only be sought as an alternative remedy where, as here, there has been a "total breach" of the contract. RESTATEMENT (SECOND) OF CONTRACTS § 373 cmt. a (1981).

At this point, it is helpful to clarify that GuestHouse's complaint seeks restitution only as an alternative remedy for breach of contract. In discussing the topic, we note that "a troubling aspect of restitution is that it has numerous applications." TENN. CONTRACT LAW AND PRAC., *supra,* § 12:56. In addition to serving as an alternate remedy for the breach of a valid, enforceable contract, restitution "can function as a substantive theory of implied contractual liability" and can provide "a remedy under a voidable contract," such as a contract that is voided on the basis of fraud, duress, mistake, and the like. *See, e.g., Richards v. Taylor,* 926 S.W.2d 569 (Tenn.Ct.App.1996) (discussing a voidable contract for lack of consideration). While

these other functions for restitution can be based on the unjust enrichment of the defendant, restitution as a remedy for breach is based in contract, not unjust enrichment.[58]

As noted by the trial court below, "restitution as a remedy ... requires unwinding the entire transaction." TENN. CONTRACT LAW AND PRAC., *supra,* § 12:55. Returning the parties to the *status quo ante:*

> ... is a general rule, not an absolute rule. Generally, upon rescission of a contract, the parties must be placed only in substantially the same condition as they were when the contract was executed, or as near thereto as possible.... [S]uch restoration as is practicable or reasonably possible and demanded by the equities of the case is sufficient.

17B C.J.S. *Contracts* § 489 (2009) (footnotes omitted). However, even under this standard, rescission and restitution can only apply "to a transaction that may still be unwound." RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 37 cmt. a (Ten. Draft No. 3, 2004).

The trial court below foreclosed the possibility of GuestHouse seeking rescission and restitution because, on the facts presented, it determined that the parties could not be returned to the *status quo ante.* At that point, however, the litigation had not progressed to a point at which GuestHouse was required to elect between the inconsistent remedies of damages or restitution.[59] Tenn. R. Civ. Proc. 8.05(2). Certainly we agree with the trial court's

---

58. Thus, restitution as a contract remedy "occup[ies] the borderland of restitution and contract." RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT II (Ten. Draft No. 3, 2004) (introductory note). Rescission and restitution for breach of a valid and enforceable contract does not seek to punish the party who breached or bestow a windfall on the nonbreaching party. RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 38 (Ten. Draft No. 3, 2004); STEVEN W. FELDMAN, TENN.

PRAC. SERIES CONTRACT LAW AND PRACTICE § 12:57 (Supp.2009).

59. New Shoney's argues that GuestHouse has in fact already made its election of remedies. By seeking and obtaining injunctive relief to permit GuestHouse to use the Shoney's Inn service marks pending resolution of the litigation and by continuing to use the service marks for the remaining Shoney's Inn motels, New Shoney's argues, GuestHouse has al-

observation as to the near impossibility of "unwinding" the series of transactions back to the 1996 license agreement, particularly in light of the change in the parties to the transactions. ShoLodge and Old Shoney's performed under the Amended and Restated License Agreement for ten years following the 1996 lump-sum payment of $5.25 million under the 1991 Original License Agreement and, during that time, ShoLodge freely used its right to use the Shoney's Inn service marks. Moreover, the lump-sum payment of $5.25 million was not made by GuestHouse; it was made by ShoLodge under the 1991 Original License Agreement—a contract to which GuestHouse was not a party. Therefore we agree with the trial court's view of restitution in the form of a simple award to GuestHouse of the $5.25 million lump sum payment and made by GuestHouse's predecessor ShoLodge.

The same cannot be said, however, of the trial court's dismissal of GuestHouse's alternative remedy of an award of $3 million as the lost "value of GuestHouse's rights" at the time that New Shoney's breached the Amended and Restated License Agreement. The trial court dismissed this claim with only a brief statement that this alternative remedy for breach "is restitution and not available." However, these claimed damages do not appear to be related to the return of any sums paid by GuestHouse or its predecessor; rather, they are claimed to be the value of the licensure rights GuestHouse owned at the time of the breach and, thus, appear to constitute alleged damages resulting from the breach, not restitution. An award of these damages allegedly would place GuestHouse back into the position it would have been in had the

contract been enforced. Therefore, these alternative damages would not be "restitution," and we reverse the trial court's finding to the contrary.

All of which leads to the larger point, namely, at this stage in the proceedings, it appears premature to dismiss any asserted remedy for breach. We have held that the rescission and termination of the Amended and Restated License Agreement by New Shoney's constituted a breach of that agreement. The determination of the appropriate award for that breach "depends upon a showing of what justice requires in the particular circumstances; a decision to award such a remedy [restitution] thus, necessarily, rests in the discretion of the court." 17B C.J.S. *Contracts* § 604 (2009). This will require the trial court to take an overall view of the parties' claims and counterclaims. The counterclaims asserted by New Shoney's are not before us in this appeal, as the trial court's rulings on the counterclaims were not made final and appealable under Tennessee Rules of Civil Procedure 54.02. Nevertheless, our holding on the breach of the Amended and Restated License Agreement by New Shoney's clearly changes the landscape of the litigation and will necessitate reconsideration of some of the rulings below on the counterclaims.

Moreover, while New Shoney's is dismissive of the assertion by GuestHouse that damages for the breach will be difficult to prove, at the summary judgment stage, we must assume this assertion to be true. The task of sorting the parties' claims and fashioning an appropriate remedy will fall to the trial court on remand. It will be no easy task. Despite the fact that we agree with the trial court's assessment of the feasibility of returning the parties to *sta-*

ready chosen to reaffirm the contract. While the trial court noted that restitution is inconsistent with reaffirmation of the license agreement, it did not reach the issue of whether

GuestHouse had in fact already elected its remedy by obtaining injunctive relief. Thus, we decline to reach this issue.

*tus quo ante* as of the date of the 1996 lump sum payment, we think it unwise for us to foreclose from the trial court remedial options which may ultimately include, at least in part, an element of restitution.

For this reason we must reverse the trial court's dismissal of Guest House's claim for restitution and, in the alternative, for the claimed value of its licensure rights.

### Liability of Sholand ("Old Shoney's")

On appeal, GuestHouse's argument that the trial court erred in dismissing its complaint also applies to its claims asserted against Old Shoney's. GuestHouse's primary claims against Old Shoney's in the complaint are that, (1) in the event that the Amended and Restated License Agreement is unenforceable, Old Shoney's is liable to GuestHouse for GuestHouse's reasonable reliance on the 2006 Consent and Estoppel Agreement; and (2) Old Shoney's is liable for restitution damages as the assignor of the Amended and Restated License Agreement. Our holding that the Amended and Restated License Agreement is enforceable pretermits issues regarding the enforceability of the Consent and Estoppel Agreement. Furthermore, because we have reversed the grant of summary judgment on GuestHouse's claim of restitution, we need not reach the issue of any "assignor liability" of Old Shoney's.[60] Thus, we decline to address the issue of Sholand's liability, if any, as assignor or otherwise.

### CONCLUSION

In sum, we conclude that the Amended and Restated License Agreement was supported by adequate consideration, and that GuestHouse did not commit fraud or violate any other provisions of the agreement;

therefore, New Shoney's breached the Amended and Restated License Agreement by terminating it without a valid basis on which to do so. In addition, we conclude that the trial court erred in determining that ShoLodge waived its right to franchise new Shoney's Inn motels under the terms in the Amended and Restated License Agreement, because the doctrine of waiver is not applicable to the facts of this case. We also reverse the trial court's holding that, as a matter of law, GuestHouse is not entitled to either restitution or the claimed value of its licensure rights as a remedy for the breach by New Shoney's, because summary judgment on these remedies for breach is premature at this juncture. Thus, we reverse the trial court's grant of summary judgment in favor of the Appellees on all of the claims asserted by GuestHouse in its amended complaint.

All other issues raised in this appeal that were not specifically addressed are either pretermitted by our holdings herein or were not included in the rulings that were made final and appealable under Rule 54.02 of the Tennessee Rules of Civil Procedure.

The trial court's decision is reversed and the cause is remanded for further proceedings consistent with this Opinion. Costs on appeal are to be assigned against Appellees Shoney's North America Corp. and Sholand, LLC, for which execution may issue, if necessary.

### APPENDIX

#### Summary of Essential Parties and Transactions

**October 1991:** Old Shoney's (owner of service marks) sells its subsidiary, Shoney's Lodging, Inc./LLC, to ShoLodge.

---

**60.** Such a ruling may have been implicit in its grant of the motion for summary judgment filed by Old Shoney's/Sholand, but the ruling on Sholand's motion was not made final and appealable under Rule 54.02.

**1992, 1994, 1995, early 1996:** ShoLodge and Old Shoney's execute four amendments to the 1991 Original License Agreement.

**October 1996:** ShoLodge and Old Shoney's execute Amendment No. 5 to the 1991 Original License Agreement providing for a $5.25 million payment from ShoLodge to Old Shoney's in lieu of future royalties.

**September 2000:** ShoLodge and Old Shoney's execute the Amended & Restated License Agreement to, *inter alia,* permit ShoLodge to operate non-Shoney's restaurants in Shoney's Inn motels that have no adjoining Shoney's restaurant.

**May 2002:** ShoLodge acquires assets of GuestHouse Int'l Franchise Systems, Inc. (includes 70 existing GuestHouse hotels).

**2002–2006:** ShoLodge announces its intent to convert Shoney's Inn motels to GuestHouse Inns & Suites hotels; opens no new Shoney's Inn motel franchises during this period.

**December 2006:** ShoLodge sells its entire hotel system, including all GuestHouse hotels and Shoney's Inn motels, to SettleInn/GuestHouse Int'l; Old Shoney's consents to the assignment of the Amended and Restated License Agreement from ShoLodge to GuestHouse in the Collateral and Estoppel Agreement.

**December 28, 2006/January 2007:** Old Shoney's and New Shoney's execute asset purchase agreement; New Shoney's becomes the Licensor of the Shoney's Inn service marks.

**April 2007:** Old Shoney's announces plans to re-vitalize Shoney's restaurant system.

**June 2007:** GuestHouse writes a letter to New Shoney's expressing its intent to re-launch Shoney's Inn motel chain. New Shoney's objects to use of the Shoney's Inn service marks.

**August 16, 2007:** GuestHouse Int'l announces to the public its intent to relaunch Shoney's Inn brand motel chain.

**August 17, 2007:** New Shoney's sends letter to GuestHouse rescinding/terminating 2000 Amended & Restated License Agreement

**August 20, 2007:** Guesthouse files this lawsuit against Old Shoney's and New Shoney's.